## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**RONALD AND MELODY LAROE,**
**individually, and on behalf of those**
**similarly situated,**

      **Plaintiffs,**

**v.**                                **Case No. 17-2487-DDC-JPO**

**FCA US, LLC**
**f/k/a CHRYSLER GROUP, LLC, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiffs Ronald and Melody LaRoe, individually, and on behalf of those similarly situated, filed this lawsuit against two defendants FCA US, LLC ("FCA US," f/k/a Chrysler Group) and ZF North America, Inc. ("ZF NA"). Plaintiffs allege that defendants acted in concert to defraud the owners of about 320,000 FCA US-manufactured vehicles in the United States. *See* Doc. 41 (Second Amended Complaint) at 1. Defendants' scheme to defraud, plaintiffs allege, involved defective wire harnesses in some of the vehicles that FCA US had manufactured. Plaintiffs also allege that the resulting recall of those vehicles played a role in the alleged scheme. Specifically, plaintiffs allege that both defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count I). Plaintiffs also allege that FCA US: violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et. seq.* (Count II); breached the implied warranty of merchantability under Kan. Stat. Ann. § 84-2-314 (Count III); and violated the Kansas Consumer Protection Act ("KCPA"), Kan. Stat. Ann. § 50-623 *et. seq.* (Count IV).

In separate motions, defendants have moved to dismiss these claims. Specifically, FCA US asks the court to dismiss all claims under Rule 12(b)(1) for lack of standing and, alternatively, under Rule 12(b)(6) for failing to state a claim. *See* Doc. 42. ZF NA seeks dismissal for the same reasons.[1] *See* Doc. 62. ZF NA also asks the court to dismiss the claims of unnamed, out-of-state putative class members under Rule 12(b)(2). *Id.* For the reasons discussed in Section II, the court concludes that plaintiffs lack standing. But at the end of this Order, the court, exercising its discretion, grants plaintiffs leave to amend their Complaint if they so choose.

## I.    Facts

The following facts are taken from plaintiffs' Second Amended Complaint (Doc. 41). The court accepts the facts asserted in this Complaint as true and views them in the light most favorable to plaintiffs. *Garling v. EPA*, 849 F.3d 1289, 1292 (10th Cir. 2017) (first quoting *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014); then citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002)).

### A.    Wire Harness

The Second Amended Complaint (the "Complaint") alleges that during model year 2014 to 2016, FCA US manufactured at least 320,000 cars and SUVs with defective sensor wire harnesses (collectively, "affected vehicles"). The wire harness[2] at issue is a component inside

---

[1]    ZF NA, it appears, misinterpreted plaintiffs' Complaint to assert MMWA, implied warranty of merchantability, and KCPA claims against it as well. So, it argued for dismissal of all claims under Rule 12(b)(6). Plaintiffs confirmed in their Opposition that they did not intend to allege "any warranty or consumer protection claims against ZF [NA]"—"only the RICO claim." *See* Doc. 67 at 15.

[2]    A wire harness, generally, is an assembly of cables or wires that transmits signals or electrical power. The assembly of cables or wires are bound together by straps, cable ties, cable lacing, sleeves, electrical tape conduit, a weave of extruded string, or a combination of these things. Wire harnesses are commonly used in automobiles.

the affected vehicle's 9-speed transmission—also referred to as a transaxle transmission.  This wire harness transmits electrical currents between the transmission and some of its associated sensors and transmission control computers to activate solenoids[3] within the transmission. Solenoids ultimately control which gear the automatic transmission selects, and when it selects that gear.  The wire harness at issue here is displayed below:[4]



This specific wire harness is used to carry signals which determine when the automatic transmission needs to shift.  The wire harness plugs into the valve body assembly—essentially

---

[3]    Solenoids are the devices that perform the actual physical "work" of shifting between gears within the transmission.

[4]    Doc. 41 at 6 (citing FCA US's Dealer Service Instructions for Safety Recall S55/NHTSA 16V-529, 15, Figure 9 (revised Feb. 2017) [hereinafter "Dealer Service Instructions"]).

the main control center of the automatic transmission.[5]  The following picture displays that

assembly:[6]



---

[5]    The valve body is:

    "the control center of the automatic transmission.  It contains a maze of channels and passages
that direct hydraulic fluid to the numerous valves which then activate the appropriate clutch
pack or band servo to smoothly shift to the appropriate gear for each driving situation.  Each
of the many valves in the valve body has a specific purpose and is named for that function.  For
example, the 2-3 shift valve activates the 2nd gear to 3rd gear up-shift or the 3-2 shift timing
valve which determines when a downshift should occur."

Doc. 41 at 8 n.10 (quoting Charles Ofria, A Short Course on Automatic Transmissions, CarParts.com,
http://www.carparts.com/transmission.htm (last visited May 18, 2018)).

[6]    Doc. 41 at 8 (citing Dealer Service Instructions at 14, Figure 8).

The Complaint alleges that the wire harnesses at issue are defective because they were manufactured with insufficient wiring crimps.[7]  This defect can cause electrical resistance to become too great, and when it does, trigger solenoid faults that suddenly and unexpectedly—*i.e.*, without warning—shift the transmission into neutral during normal operation.  This picture displays typical crimps:[8]



Large-scale manufacturing assembly plants, like the ones used by ZF NA and FCA US, make crimps by using automated machinery with specific crimp specifications.  The wiring crimp then allows the wire harness to be "plugged into" the appropriate connector for whatever purpose it is being used, as displayed in the following picture.[9]

---

[7]    Crimps keep a group of wires in the wire harnesses together snugly to ensure that conductivity and connectivity is maintained.

[8]    Doc. 41 at 7.

[9]    Doc. 41 at 7.



The Complaint alleges that defendants' wire harnesses are defective because one or more of the crimps was not tight enough. This alleged manufacturing defect is latent because: it is not readily visible; it is not easy to inspect without spending hours removing the transmission to gain access to the wire harness; and the problems caused by the defective and insufficient crimps of the wire harness can take months or years to manifest themselves. Once the defect manifests, an affected vehicle suddenly and unexpectedly can shift into neutral, or even get stuck in a fixed gear. The Complaint also alleges that these manifestations can occur after an update to the vehicle's powertrain and transmission software.

**B.    Defendants Learn about Defect**

The Complaint alleges that, by July 10, 2014, ZF NA knew the root cause of the defect. The Complaint also alleges that FCA US knew about the defect "well before" July 2016 and potentially earlier than it informed the National Highway Traffic Safety Administration ("NHTSA") of the defect. Doc. 41 at 3.

In July 2016, FCA US submitted a Safety Recall Report under 49 C.F.R. Part 573 to NHSTA. In this report, FCA US informed NHSTA: "'Some . . . vehicles may have insufficient crimps in the transmission wire harness that may cause an unexpected shift to neutral resulting in a sudden loss of motive power.'" *Id.* at 9 (quoting FCA US's Initial 49 C.F.R. Part 573 Report to NHTSA submitted on July 12, 2016 [hereinafter "Part 573 Report"]) (ellipsis in original). FCA

US also explained, "'The remedy program for this recall is under development.'"  *Id.* at 11

(quoting Part 573 Report).  FCA US included a draft Recall Notice with the Safety Recall

Report.

     Between July and August 2016, FCA US sent the Recall Notice to owners of the affected

vehicles.  This notice described the problem in this fashion:

> The transaxle wire harness on your vehicle may have been built with insufficient
> wire terminal crimp(s).  This may cause an intermittent high electrical resistance in
> the transaxle wire harness circuit(s).  A high resistance circuit(s) in this wiring
> harness will cause the on-board diagnostic system to set a Diagnostic Trouble Code
> (DTC).  When the DTC is set, the system defaults the transaxle to neutral and the
> customer experiences a loss of motive power.  Motive power can usually be
> regained upon a restart.  The loss of motive power could cause a crash without
> warning.

*Id.* at 9 (quoting Interim Recall Notice for Safety Recall S55/NHTSA 16V-529 [hereinafter

"Interim Recall Notice"]) (internal quotation marks omitted).  FCA US then explained its

intentions in this way:

> FCA [US] intends to repair your vehicle free of charge (parts and labor).  However,
> the parts required to provide a permanent remedy for this condition are currently
> not available.  FCA [US] is making every effort to obtain these parts as quickly as
> possible.  FCA [US] will contact you again by mail, with a follow-up recall notice,
> when the remedy parts are available.

*Id.* at 10 (quoting Interim Recall Notice) (emphasis in original) (internal quotation marks

omitted).

     Plaintiffs allege that FCA US never intended to provide a "permanent remedy" and also

that it knew that it had no intention of providing one for the defective wire harnesses in all

320,000 vehicles.  Plaintiffs allege that, rather than replace the wire harness, defendants elected

to perform a software update that failed to cure the defect's manifestations.

     On October 6, 2016, FCA US amended its Part 573 Safety Recall Report to include the

following:  "'FCA US will reprogram the Powertrain Control Module ('PCM') and the

Transmission Control Module ('TCM').  In addition, if the vehicle has an active or stored fault code, the transaxle range sensor wire harness will be replaced.'"  *Id.* at 56 (quoting Part 573 Report, as amended Oct. 6, 2016).  Consistent with this amended report, FCA US instructed its dealers as follows:  "'Due to the low expected failure rate, do not order a transaxle range sensor wire harness until you verify the specified DTC's.  A parts ordering restriction has been assigned to help manage harness part availability.'"  *Id.* at 11 (quoting Dealer Service Instructions at 3).

Plaintiffs allege that, rather than replace the defective wire harness in all affected vehicles, FCA US instructed its dealers to update the affected vehicles' powertrain and transmission software modules unless a DTC revealed that the affected vehicle had suffered a loss of motive power.  FCA US estimated that only 5% of affected vehicles would have a DTC showing such a loss.  And when that loss occurred, the dealer would replace the defective wire harness.[10]  Later, FCA US sent another notice letter to owners.  It mentioned that FCA US would use a software update as part of a recall.

The Complaint alleges that the software update just changed the way the defect manifests itself.  But the defect remains.  Specifically, the software update forces the car to shift unexpectedly into "'fixed-gear limp mode.'"  *Id.* at 12 (quoting Dealer Service Instructions at 2).  The Complaint also alleges that FCA US never told NHSTA, dealers, or affected vehicle owners about this mode and, also, that FCA US never explained how to drive the vehicle in it.  FCA US also did not explain which gear the vehicle selects for the fixed-gear limp mode.  For example,

---

[10]    Plaintiffs allege that the cost to replace the wire harness in the affected vehicles is about $550 per car.  Plaintiffs arrive at that total in this way:  The wire harness, part number CSVF551AA, or CSFFS552AA, retails for about $80.00 and the replacement valve body O-Ring Kit part number CSVFS555AA retails for about $5.00; three quarts of automatic transmission fluid part number 68218925AA retails for about $30.00 per quart, or $90.00; and the 2.7 to 3.0 hours of labor can cost about $375.00 (depending on the rates charged by the local FCA US dealer where the consumer lives).

FCA US did not explain whether the car always selects the same pre-determined gear of the nine available forward speeds or, instead, simply selects the last gear the transmission had been using just before the fault occurred.

### C.    Plaintiffs Purchase a Jeep Cherokee

Around August 9, 2014, plaintiffs purchased a brand-new 2014 Jeep Cherokee from a full-service FCA US dealership.  When plaintiffs purchased the Cherokee, it had about 52 miles on the odometer.  Plaintiffs were the first and—to-date—only owners of this Cherokee.  With the purchase of the Cherokee, FCA US provided a written warranty.  The warranty applied for a term of three years or 36,000 miles, the standard manufacturer's warranty that FCA US extended to all its vehicles.  Fiat-Chrysler calls this its "Basic Limited Warranty."  It covers the entire vehicle, except tires.

In 2015, plaintiffs began experiencing an increasing number of problems with their Cherokee.  In the words of the Complaint, "[a]round" December 2016, after receiving the recall notice from FCA US, plaintiffs scheduled a service appointment at their dealership.  Doc. 41 at 16.  On December 5, 2016, plaintiffs understood that the dealership had performed the recall work on their Cherokee.  At the time, plaintiffs' Cherokee had about 32,460 miles on its odometer.  After the dealership performed the recall work, it told plaintiffs that they had performed the repairs as needed under Safety Recall S55/NHTSA 16V-529 and, in lay terms, had "fixed" plaintiffs' Cherokee.

Sometime later, plaintiffs' Cherokee would not start.  So plaintiffs had it towed to a dealership in Kansas.  Then, plaintiffs learned that the dealership they used in Lee's Summit, Missouri, had performed a software update but did not replace the wire harness.

Plaintiffs allege that other consumers have experienced the nine-speed transmission defects. By June 30, 2016, FCA US had received 3,981 warranty complaints "potentially" about the wiring harness defect. Doc. 41 at 18. By August 2016, NHSTA had received 661 complaints from consumers about the transmissions in their Jeep Cherokees and another 130 consumer complaints about the Chrysler 200 model.

## II.    Analysis

Defendants argue that plaintiffs' allegations are deficient for several reasons. First, both defendants contend that plaintiffs lack standing because they do not allege an injury-in-fact. Second, ZF NA alone argues that plaintiffs cannot establish that it is subject to general personal jurisdiction in Kansas, so the court should dismiss the claims asserted on behalf of out-of-state putative class members. Third, both defendants contend that all four Counts of plaintiffs' Complaint fail to state a plausible claim.

For the reasons discussed in the subsections below, the court finds that plaintiffs lack standing to assert their claims.[11]

### A.    Legal Standard under Rule 12(b)(1)

Defendants move for dismissal of this lawsuit under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted). Federal district courts have original jurisdiction over all civil actions arising under the constitution, laws, or treaties of the United States or where there is diversity of citizenship. 28 U.S.C. § 1331; 28 U.S.C. § 1332. "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes

---

[11]    Because the court reaches this conclusion, it does not address defendants' other arguments for dismissal.

apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted).  Since federal courts are courts of limited jurisdiction, there is a presumption against jurisdiction, and the party invoking federal jurisdiction bears the burden to prove it exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Generally, a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) takes one of two forms:  a facial attack or a factual attack.  *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995).  "First, a facial attack on the complaint's allegations [of] subject matter jurisdiction questions the sufficiency of the complaint.  In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true."  *Id.* at 1002 (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)) (internal citations omitted).

"Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends."  *Id.* at 1003.  This is called a factual attack.  *Id.*  "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide discretion to allow affidavits, other documents, and [to conduct] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."  *Id.* (citations omitted); *Los Alamos Study Group v. United States Dep't of Energy*, 692 F.3d 1057, 1063–64 (10th Cir. 2012); *see also Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1324–25 (10th Cir. 2002) (holding that a court must convert a motion to dismiss to a motion for summary judgment under Fed. R. Civ. P. 56 only when the jurisdictional question intertwines with the case's merits).

The jurisdictional attack presented by defendants' motion here is a facial one.[12]

---

[12]    Although defendants filed separate motions, ZF NA's motion simply incorporates FCA US's arguments.  *See* Doc. 63 at 15–16.  So the court treats them as one motion.

### B.    Plaintiffs Lack Standing

Defendants seek dismissal of all claims under Rule 12(b)(1) because, they assert, plaintiffs lack Article III standing.  Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To present a case or controversy under Article III, plaintiffs must establish that they have standing to sue.  *Id.* (citations omitted); *see also Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  Article III standing requires plaintiffs to establish (1) that they have "suffered an 'injury in fact'"; (2) that the injury is "'fairly . . . trace[able] to the challenged action of the defendant'"; and, (3) that it is "'likely'" that "the injury will be 'redressed by a favorable decision.'"  *Ariz. Christian Sch. Tuition Org.*, 563 U.S. at 134 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016); *Awad v. Ziriax*, 670 F.3d 1111, 1120 (10th Cir. 2012).

"At bottom, the gist of the question of standing is whether [plaintiffs] have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007) (internal quotation marks and citation omitted).  That plaintiffs have filed this lawsuit as a class action does not change the standing analysis because "even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).

Defendants argue that plaintiffs lack standing because they have failed to allege that they sustained an injury-in-fact.  To plead injury-in-fact, plaintiffs must allege facts that, if true, would show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan*, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).  "A 'concrete' injury must be '*de facto*;' that is, it must actually exist." *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)).  In other words, "a main focus of the standing inquiry is whether plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury." *Morgan v. McCotter*, 365 F.3d 882, 888 (10th Cir. 2004).

Defendants' motion asserts that the Complaint—although lengthy—never alleges that these plaintiffs have sustained an actual or imminent injury.  They contend that plaintiffs merely allege the possibility of a future injury, something that is too conjectural or contingent to satisfy the standing requirement.  The court agrees with defendants.

Plaintiffs' Complaint alleges several theoretical injuries:  an insufficient wire crimp on the wire harness, an unexpected shift to neutral, or an unexpected shift to fixed-gear limp mode.  But plaintiffs never allege that *they* have sustained any of these injuries.  The Complaint's relevant allegations can be summarized in this way:  In 2015, plaintiffs experienced unidentified "problems" with their Cherokee; in 2016, they responded to the recall notice by having their Cherokee serviced; the servicing dealership performed a software update, telling plaintiffs their Cherokee was "fixed;" at some undisclosed time after the update, their Cherokee would not start; and a second dealership told plaintiffs that the first dealership merely had completed a software update but had not replaced the wire harness.  Doc. 41 at 16–17 ¶¶ 62–68.

13

What's missing from plaintiffs' Complaint is telling. Plaintiffs never allege that they have sustained a present "injury-in-fact" (or even an imminent one) that is "fairly trace[able]" to defendants' actions challenged by the Complaint's claims. *See Clapper*, 568 U.S. at 408. To be sure, the Complaint alleges that plaintiffs' Cherokee experienced some unidentified problems. But it never alleges that these problems—whatever they were—are "fairly traced" to one or more problematic wire crimps. Plaintiffs also allege that their Cherokee would not start. But the Complaint never alleges that this outcome is fairly traced to a wire crimp, the software update, or any unexpected shifting.

In many respects, plaintiffs' Response to FCA's Motion to Dismiss is even more telling. For in it, plaintiffs rely on a number of allegations that the Complaint never makes. For instance, plaintiffs' Opposition asserts that the Complaint "plainly states the defect exists" and that they have "experienced symptoms of the defect" and "sought to have to have it repaired." Doc. 59 at 22. But plaintiffs never specify where the Complaint makes these allegations. And indeed, it does not.

Plaintiffs' Response begins by making small insertions. For example, the Complaint alleges: "Beginning sometime in 2015, [plaintiffs] began having an increasing number of problems in their Cherokee." Doc. 41 at 16 ¶ 62. Plaintiffs argue that this allegation means that "they first experienced the defect complained of in this lawsuit in 2015." Doc. 59 at 22 (citing Doc. 41 at 16 ¶ 62). Yet the Complaint's allegations never connect these "problems" with the alleged "defect." Also, plaintiffs mention unidentified problems and then move on without ever tracing those problems to any alleged defect.

At other times, plaintiffs' Response employs an ever-blunter tactic. It simply adds wholesale allegations that the Complaint never makes. For example, plaintiffs' Response

14

asserts—again without referencing the Complaint specifically—that plaintiffs' "2014 Jeep

Cherokee has experienced problems with the shifting and intermittent hesitation and 'stalls' in

acceleration that are frightening and dangerous when trying to merge into traffic or make left

turns." *Id.* Also—and again with no reference to the Complaint—plaintiffs' Response argues

that their Jeep Cherokee "has manifested a variety of defects and malfunctions including a

panoply of problems with the operation of the subject 9-speed transmission . . . ." *Id.* at 24. But

neither of these assertions bears any connection to an allegation in the Complaint. Plaintiffs'

tactic is one that the governing law simply will not abide.

When reviewing a facial attack on the Complaint, a district court must "accept the

allegations in the complaint as true." *Holt*, 46 F.3d at 1002. But this standard doesn't permit the

court to rely on new assertions made elsewhere. And it doesn't entitle plaintiffs to sprinkle new

allegations into the record whenever they choose. In short, the court cannot accept or rely on

plaintiffs' after-the-fact assertions as true because they never pleaded those allegations in the

Complaint.

The court's view of this Complaint's standing deficiencies comports with a long line of

other cases. *See, e.g.*, *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir.

2011) ("In asserting a warranty claim, it 'is not enough' for a plaintiff 'to allege that a product

line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs

must allege that their product actually exhibited the alleged defect.'" (quoting *O'Neil v.

Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009))); *Katz v. Fiat/Chrysler Auto.*, No. 3:15-CV-

0036, 2015 WL 2452419, at *3 (M.D. Pa. May 21, 2015) (finding that allegations are insufficient

to establish injury-in-fact, when plaintiff merely alleges that "the defect places him at increased

risk of possible future injury" but the "defect [only] materialized in a small percent of persons

15

who bought the automobile in question"); *Chan v. Daimler AG*, No. CIV.A. 11-5391 JLL, 2012 WL 5827448, at *8 (D.N.J. Nov. 9, 2012) ("The fact that [plaintiffs'] respective vehicles may have contained defects making them prone to failure in the future is an insufficient basis for Article III standing.").

Undaunted, plaintiffs assert that their injury included a diminution of value of their Cherokee because it has a defective wire harness. The court finds a case from the Central District of California instructive on this point. *See Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 972–73 (C.D. Cal. 2014) (dismissing claims for lack of standing and holding plaintiffs' conclusory allegations that they had overpaid for their vehicles now diminished in value because of a recently discovered defect were insufficient). In *Tae Hee Lee*, the court held that "claims of 'diminished value' and 'overpayment' [are] only allowed to proceed for those plaintiffs who had pled 'something more,' including having stopped using vehicles for fear of personal safety or having sold or traded-in vehicles at a loss due to depressed resale values following recalls and publicized alleged incidents." *Id.* at 973. In this case, the court concluded that plaintiffs had failed to allege "that the [car's] pre-collision braking feature fail[ed] to work as described; that they experienced any problems with [pre-collision system]; that they are unwilling to drive their vehicles; that they sold or traded-in their vehicles at a loss; or any other facts that plausibly demonstrate any diminished value in their vehicles." *Id.* And so, the court dismissed the Complaint because plaintiffs lacked standing.

Plaintiffs' similar allegations here are insufficient. Plaintiffs have failed to allege that *their* Cherokee's transmission doesn't work; that *they* experienced any problems with their Cherokee's wire harness; that *they* are unwilling to drive their Cherokee; or that *they* have sold or traded (or attempted to trade) their Cherokee at a loss. In short, plaintiffs have failed to allege

16

"something more" than theoretically diminished value. *See id.*; *see also Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1280 (C.D. Cal. 2016) (concluding that both overpayment and diminution of value are cognizable injuries in fact but plaintiff had failed to plead facts capable of providing a plausible basis for either one).

For these reasons, the court concludes that plaintiffs have failed to plead facts capable of showing that they have standing to bring this lawsuit.

### C.    Amending the Complaint

While the court could grant defendants' motions and dismiss the cause of action without prejudice, plaintiffs' Response to FCA US's Motion to Dismiss includes several assertions that extend beyond the allegations in the Complaint. If plaintiffs had amended their Second Amended Complaint to include properly pleaded facts capable of supporting those assertions, they likely would satisfy—at least at the pleading stage—the requirement for injury-in-fact.

The decision whether to grant leave to amend a Complaint is committed to the court's discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971); *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). Fed. R. Civ. P. 15(a)(2) provides that courts should "freely give leave when justice so requires." "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (citations omitted). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason . . . ." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239–40 (10th Cir. 2001) (citations omitted).

Here, an amended Complaint that includes pleaded facts capable of supporting plaintiffs' additional assertions likely would not be futile. Such facts, if pleaded properly, likely could satisfy the standing requirement. The court thus grants plaintiffs leave to amend their Second Amended Complaint to assert such facts—if they can do so properly and choose to do so.

Naturally, any amended Complaint must comply with Rule 11. Under Rule 11, a signer of a pleading "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the "claims, defenses, and other legal contentions are warranted by existing law" and "the factual contentions have evidentiary support . . . ." Fed. R. Civ. P. 11(b)(2), (3). Also, Fed. R. Civ. P. 8(a)(2) requires that a Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." And though this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As the Supreme Court explained, a purely mechanical narration simply "will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

For the reasons discussed above, the court will dismiss this case without prejudice unless, within 21 days of the date of this Order, plaintiffs file a Third Amended Complaint which alleges facts that—if proven true—could satisfy that standing requirement.

As a final note, the court acknowledges that it does not address defendants' arguments to dismiss plaintiffs' claims under Rules 12(b)(2) and 12(b)(6). In all candor, this ruling on the current motion may present nothing more than the latest installment in an already extensive pleading saga. But this is unavoidable. On the current record, plaintiffs lack standing. This conclusion means that the court lacks subject matter jurisdiction over the case. *See Jepsen v.*

*Texaco, Inc.*, 68 F.3d 483 (10th Cir. 1995) ("Lack of standing divests the court

of subject matter jurisdiction . . . .").  And without subject matter jurisdiction, the court cannot

decide the Rule 12(b)(2) and 12(b)(6) issues because those rulings would amount to advisory

opinions.  *See Camreta v. Greene*, 563 U.S. 692, 717 ("The 'judicial Power' is one to render

dispositive judgments, not advisory opinions." (internal quotation marks and citation omitted)).

      **IT IS THEREFORE ORDERED BY THE COURT THAT** unless plaintiffs file a

Third Amended Complaint within 21 days of the date of this Order, the court will grant

defendant FCA US's Motion to Dismiss (Doc. 42) in part, grant defendant ZF NA's Motion to

Dismiss (Doc. 62) in part, and dismiss this case without prejudice.

      **IT IS SO ORDERED.**

      **Dated this 25th day of June, 2018, at Topeka, Kansas.**

                                 **s/ Daniel D. Crabtree**
                                 **Daniel D. Crabtree**
                                 **United States District Judge**