# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**RONALD AND MELODY LAROE,**
**individually, and on behalf of those**
**similarly situated,**

      **Plaintiffs,**

**v.**

**FCA US, LLC**
**f/k/a CHRYSLER GROUP, LLC, et al.,**

      **Defendants.**

**Case No. 17-2487-DDC-JPO**

## MEMORANDUM AND ORDER

This matter comes before the court on defendants FCA US, LLC ("FCA US," f/k/a/ Chrysler Group), and ZF North America, Inc.'s ("ZF NA") Motions to Dismiss (Docs. 100 & 102). Plaintiffs Ronald and Melody LaRoe, individually, and on behalf of those similarly situated, have filed their Fourth Amended Complaint (Doc. 95) in this case. This filing—like its predecessors—alleges that defendants acted in concert to defraud owners of some 320,000 vehicles manufactured by FCA US. Specifically, plaintiffs allege that defendants' scheme involved defective wire harnesses placed in some—but not all—FCA US-manufactured vehicles. The Fourth Amended Complaint substantially reduces the claims that plaintiffs assert. It merely claims that defendants violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"). As they argued in previous Motions to Dismiss (Docs. 42 & 62), defendants contend that plaintiffs do not have standing to assert their claim. *See* Doc. 101 at 19–21; Doc. 103 at 16–18.

For reasons explained below, the court again concludes that plaintiffs lack standing to bring the RICO claim asserted in their Fourth Amended Complaint. But, exercising its

discretion, the court grants plaintiffs leave—one last time—to amend their Fourth Amended Complaint if they choose to do so.

## I.      Background

This section briefly summarizes the procedural history culminating in plaintiffs' Fourth Amended Complaint.  Then, it outlines the Fourth Amended Complaint's alleged facts pertinent to the court's analysis of plaintiffs' standing to assert their RICO claim.

### A.  Procedural History

Plaintiffs filed their Second Amended Complaint (Doc. 41) after the court granted their unopposed Motion seeking leave to file their amended complaint.  *See* Docs. 39 & 40.  FCA US and ZF NA both filed Motions to Dismiss (Docs. 42 & 62), arguing in part that plaintiffs lacked standing to bring their claims and moving to dismiss the claims, in part, under Federal Rule of Civil Procedure 12(b)(1).

The court agreed with defendants.  The Second Amended Complaint hadn't asserted that plaintiffs had sustained any damages arising from the malady that the allegedly defective wire harness could cause—*i.e.*, an unexpected shift in gear that "could" cause a collision.  *See* Doc. 41 at 9 (internal quotations omitted).  Also, the Second Amended Complaint didn't allege any problems with plaintiffs' car that were "'fairly trace[able]'" to actions by defendants.  Doc. 85 at 14 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).  The court also rejected plaintiffs' argument that their injury included the diminished value of their vehicle.  *See id.* at 16 (citing *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 972–73 (C.D. Cal. 2014).  *Tae Hee Lee* held that "claims of 'diminished value' and 'overpayment' [are] only allowed to proceed for those plaintiffs who had pled 'something more,' [*e.g.*,] having stopped using vehicles for fear of personal safety or having sold or traded-in vehicles at a loss due to

depressed resale values following recalls and publicized alleged incidents"). And the court found *Tae Hee Lee*'s reasoning persuasive.

But the court also granted plaintiffs leave to file another amended complaint. Plaintiffs responded with a mechanical error of their own, filing the wrong version of an amended complaint. *See* Doc. 94 (explaining that plaintiffs had filed the wrong document as their Third Amended Complaint (Doc. 88)). So, the court granted plaintiffs additional time to file a Fourth Amended Complaint—and it is that fourth generation Complaint that is before the court now.

### B. Fourth Amended Complaint

The Fourth Amended Complaint makes allegations quite similar to those included in the Second Amended Complaint. But, it changes the theory of liability: plaintiffs assert only a RICO violation, and they allege economic losses as their only injury.

When it considers defendants' motions to dismiss, the court accepts, of course, facts asserted by the Fourth Amended Complaint (Doc. 95) as true and views them in the light most favorable to plaintiffs. *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).

### 1. Allegations about all affected vehicles

During model years 2014 to 2016, the Fourth Amended Complaint alleges, FCA US manufactured at least 320,000 cars and SUVs with defective sensor wire harnesses (collectively, "affected vehicles"). The wire harness at issue is a component inside the nine-speed transmission. This wire harness transmits electrical currents, which ultimately control which gear the automatic transmission selects, and when it selects that gear. The Fourth Amended Complaint alleges that the wire harnesses are defective because they were manufactured with insufficient wiring crimps, which hold a group of wires in the harnesses together snugly and thus

maintain conductivity and connectivity.  A wiring crimp defect, plaintiffs allege, can cause electrical resistance to become too great; if that happens, a vehicle's transmission can shift into neutral suddenly during normal operation.

The Fourth Amended Complaint also alleges that ZF NA knew the root cause of the defect by July 10, 2014.  FCA US knew about the defect "well before" July 2016.  Doc. 95 at 5. And, the Fourth Amended Complaint alleges, FCA US knew about the defect "likely significantly earlier" than it informed the National Highway Traffic Safety Administration ("NHTSA") of the problem.  *Id.*  In July 2016, FCA US submitted a Safety Recall Report to NHTSA under 49 C.F.R. Part 573.  *Id.* at 11, 11 n.14.  In this report, FCA US informed NHTSA that "'[s]ome . . . vehicles may have insufficient crimps in the transmission wire harness that may cause an unexpected shift to neutral resulting in a sudden loss of motive power.'"  *Id.* at 11 (quoting FCA US's Initial 49 C.F.R. Part 573 Report to NHTSA, submitted on July 12, 2016) (ellipsis in original).  (For simplicity, this Order calls this report to NHTSA the "Part 573 Report.")  The report from FCA US also explained, "'[T]he remedy program for this recall is under development.'"  *Id.* at 13 (quoting Part 573 Report).  FCA US included a draft Recall Notice with the Safety Recall Report.

Eventually, FCA US sent the Recall Notice to owners of the affected vehicles.  This notice described the wire harness problem in this fashion:

> The transaxle wire harness on your vehicle may have been built with insufficient wire terminal crimp(s).  This may cause an intermittent high electrical resistance in the transaxle wire harness circuit(s).  A high resistance circuit(s) in this wiring harness will cause the on-board diagnostic system to set a Diagnostic Trouble Code (DTC).  When the DTC is set, the system defaults the transaxle to neutral and the customer experiences a loss of motive power.  Motive power can usually be regained upon a restart.  The loss of motive power could cause a crash without warning.

*Id.* at 11 (quoting Interim Recall Notice for Safety Recall S55/NHTSA 16V-529 [hereinafter

"Interim Recall Notice"]) (internal quotation marks omitted).  FCA US's Recall Notice also

explained that:

> FCA [US] intends to repair your vehicle free of charge (parts and labor).  However,
> the parts required to provide a permanent remedy for this condition are currently
> not available.  FCA [US] is making every effort to obtain these parts as quickly as
> possible.  FCA [US] will contact you again by mail, with a follow-up recall notice,
> when the remedy parts are available.

*Id.* at 13 (quoting Interim Recall Notice) (emphasis in original) (internal quotation marks

omitted).

Plaintiffs assert that FCA US never intended to provide a "permanent remedy" for the

defective wire harnesses in all 320,000 vehicles, and knew that it had no such intention when it

issued its Recall Notice.  Instead, plaintiffs allege, defendants chose to perform a software update

that failed to cure the defect or its manifestations.  In turn, FCA US amended its Part 573 Safety

Recall Report on October 6, 2016, to include the following language:  "'FCA US will reprogram

the Powertrain Control Module ("PCM") and the Transmission Control Module ("TCM").  In

addition, if the vehicle has an active or stored fault code, the transaxle range sensor wire harness

will be replaced.'"  *Id.* at 63 (quoting Part 573 Report, as amended Oct. 6, 2016).  Consistent

with this amended report, FCA US instructed its dealers to do the following:  "'Due to the low

expected failure rate, do not order a transaxle range sensor wire harness until you verify the

specified DTC's.  A parts ordering restriction has been assigned to help manage harness part

availability.'"  *Id.* at 14 (quoting FCA US's Dealer Service Instructions for Safety Recall

S55/NHTSA 16V-529, 3 (revised Feb. 2017) [hereinafter "Dealer Service Instructions"]).  The

Fourth Amended Complaint alleges that this "part availability" explanation was false, and that

defendants artificially imposed the restricted availability so that FCA US could avoid spending money to provide replacement parts.

Plaintiffs allege that FCA US instructed its dealers—in lieu of replacing the defective harnesses in all vehicles—to update the affected vehicles' powertrain and transmission software modules unless a DTC revealed that the vehicle had suffered a loss of motive power, as shown by an active or stored fault code. FCA US estimated that only 5% of affected vehicles would have a DTC showing that the vehicle had experienced such a loss of power. And, for those vehicles with a DTC showing a loss of power, the dealer actually would replace the defective wire harness. Later, FCA US sent another notice letter to owners of affected vehicles. This notice letter mentioned that FCA US would use a software update as part of a recall, but it never explained that the update would not include a physical repair to the defective wire harness.

In sum, the Fourth Amended Complaint alleges that the software update merely changed the way the defect manifests itself. It did not, plaintiffs allege, fix the defect. Specifically, the software update forces the car to shift unexpectedly into "'fixed-gear limp mode.'" *Id.* at 15 (quoting Dealer Service Instructions at 2). The Fourth Amended Complaint also alleges that FCA US never told NHTSA, dealers, or owners of the affected vehicle about this mode. Also, FCA US never explained how vehicle owners could drive in fixed-gear limp mode. And FCA US also did not explain which gear the vehicle would select for fixed-gear limp mode. For example, FCA US did not explain whether the car always would select the same pre-determined gear (of nine available forward speeds) or, instead, simply would select the last gear the transmission had used before the fault occurred.

The Fourth Amended Complaint alleges that plaintiffs have consulted a purported expert witness, Marthinus van Schoor.[1]  They allege that Mr. van Schoor's qualifications and opinions support their assertion that the affected vehicles remained defective after defendants' software update.  In relevant part, Mr. van Schoor has opined that unexpected gear shifts caused by defective wiring crimps could cause a collision.  He also opined that the electrical resistance caused by defective wiring crimps can increase over time.  Finally, Mr. van Schoor opined that FCA US's software update—and the fixed-gear limp mode it triggers—"does not fix the safety related aspect of [the] defect."  *Id.* at 24.  In other words, the affected vehicles that received the software update still could crash without warning because they could shift into fixed-gear limp mode.  Thus, Mr. van Schoor concluded, the only way to remedy the defect is to replace the defective wire harness.

Defendants' software update, plaintiffs allege, deceived consumers into believing that defendants had provided a permanent remedy for their vehicles' defect.  And, because of their suit and other public documents, plaintiffs assert, the value of all affected vehicles has decreased by the amount required to permanently repair these vehicles—*i.e.*, replace the defective wire harness.  Plaintiffs have calculated the replacement cost to be $550 per car.[2]

---

[1]    Other federal circuits and district courts have allowed plaintiffs to plead opinions from purported experts in their complaints while reserving the ability to rule on evidentiary issues later on.  *See, e.g.*, *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004) ("[P]ersonal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *In re Resonant Inc. Secs. Litig.*, No. 15-1970 SJO (VBKx), 2016 WL 6571267, at *5 (C.D. Cal. July 11, 2016) (concluding that "expert testimony is not barred from being plead[ed] directly into a complaint" and "assum[ing], under Federal Rule of Civil Procedure 12(b)(6), that the expert opinions referenced in the [complaint were] true, without prejudice to addressing the admissibility of the expert testimony in a *Daubert* motion filed before trial").  But while the court includes plaintiffs' allegations about Mr. van Schoor's opinions in its factual summary, these allegations ultimately do not persuade the court that plaintiffs have alleged sufficient facts to establish standing.  *See infra* Part III.B.2.

[2]    Plaintiffs allege that the cost to replace the wire harness in the affected vehicles is about $550 per car.  *See* Doc. 95 at 5 n.6.  Plaintiffs come to that figure by alleging that:  (1) the wire harness, part number CSVF551AA, or CSFFS552AA, retails for about $80.00, and the replacement valve body O-Ring Kit part number CSVFS555AA

The Fourth Amended Complaint alleges that plaintiffs have suffered several types of economic loss, including: (1) $550 in direct losses because plaintiffs will have to pay to replace their vehicle's wire harness or determine whether the wire harness is defective; (2) the diminished value of their vehicle because of the defective wire harness; (3) reasonable compensation for time, mileage, and transportation costs to replace the wire harness; and (4) reasonable compensation for every earlier visit to a dealership because of the defective wire harness, including time and costs to have the software update installed.

### 2. Allegations about plaintiffs' Jeep Cherokee

Around August 9, 2014, plaintiffs purchased a brand-new 2014 Jeep Cherokee from a full-service FCA US dealership. When plaintiffs purchased the Cherokee, it had about 52 miles on the odometer. Plaintiffs were the first and—to date—only owners of this Cherokee. But, in 2015, plaintiffs began experiencing an increasing number of problems with their Cherokee. "[A]round" December 2016, after receiving the recall notice from FCA US, plaintiffs scheduled a service appointment at their dealership. *Id.* at 26. On December 5, 2016, plaintiffs understood that the dealership had performed the recall work on their Cherokee. At the time, plaintiffs' Cherokee had about 32,460 miles on its odometer. Plaintiffs allege that they incurred out-of-pocket costs, time, and gas money to travel to the dealership for the repairs.

After the dealership performed the recall work, it told plaintiffs that it had performed the repairs as needed under Safety Recall S55/NHTSA 16V-529 and, in lay terms, had "fixed" plaintiffs' Cherokee. Sometime later—on a date not specified by the Fourth Amended Complaint—plaintiffs' Cherokee would not start. So, plaintiffs had it towed to a dealership in

retails for about $5.00; (2) three quarts of automatic transmission fluid part number 68218925AA retails for about $30.00 per quart, or $90.00; and (3) the 2.7 to 3.0 hours of labor can cost about $375.00 (depending on local rates charged by FCA US dealers where consumers live).

Kansas.  Then, plaintiffs learned that the dealership they previously had visited in Lee's Summit, Missouri, had performed a software update.  Also, they learned that the Lee's Summit dealership had not replaced the wire harness.

Plaintiffs allege that their Jeep Cherokee "carries the same defect" that the recall documents described.  *Id.* at 27.  Specifically, they assert, their vehicle was manufactured with a defective wire harness.  Plaintiffs allege that, because defendants did not track the defective vehicles, they don't know which of the affected vehicles covered by the recall notice will manifest issues caused by the defective wire harnesses.  Defendants have provided no explanation for their estimate that 5% of the affected vehicles will manifest issues caused by the defect, plaintiffs allege.  Because defendants sent the recall notice to all owners of affected vehicles, plaintiffs assert that the "defect applies to 100%" of the affected vehicles.  *Id.* at 20. And, to rule out a defect, FCA US would have to identify, remove, and inspect the wire harness in each affected vehicle.

Plaintiffs allege that they attempted to arrange for the part replacement in their vehicle, at their own cost.  They represent that they invited defendants' "litigation representatives to attend and participate in the process."  *Id.* at 29.  But defendants refused, plaintiffs allege, so plaintiffs "sought the assistance" of the court.  *Id.*  On June 5, 2018, Magistrate Judge James P. O'Hara conducted a telephone status conference with the parties about plaintiffs' inquiry.  *See* Doc. 83. During the conference, defendants expressed concerns about evidence spoliation.  And neither party provided the court with reliable evidence that replacing the allegedly defective part in plaintiffs' vehicle would pose no significant risk of spoliation.  The court thus declined to enter an order approving plaintiffs' proposed course of action.  Judge O'Hara notified plaintiffs that neither the court nor defendants were preventing plaintiffs from replacing the part in their

Cherokee if they believed they could do so without evidence spoliation. But the court also informed plaintiffs that they might have to defend a motion accusing them of evidence spoliation.

Plaintiffs also allege that other consumers have experienced the transmission defect. By June 30, 2016, FCA US had received 3,981 warranty complaints about the wiring harness defect. Doc. 95 at 30. By August 2016, NHTSA had received 661 consumer complaints about the transmissions in their Jeep Cherokees. Another 130 consumers had complained about the Chrysler 200 model.

## II.      Legal Standard

Defendants move to dismiss this lawsuit under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction because, they assert, plaintiffs have no standing to bring their claim. Standing to sue is elemental to subject matter jurisdiction, so the court must resolve this threshold question before expressing any opinion about the substance of the case's claims or defenses. *See Rivera v. IRS*, 708 F. App'x 508, 513 (10th Cir. 2017) ("Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction that [courts] must address, sua sponte if necessary, when the record reveals a colorable standing issue." (citing *United States v. Ramos*, 695 F.3d 1035, 1046 (10th Cir. 2012))). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted). Since federal courts are courts of limited jurisdiction, there is a presumption against jurisdiction, and the party invoking federal jurisdiction bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Plaintiffs assert that they are trying to track the analysis applied in *Safe Streets Alliance v.*

*Hickenlooper*, 859 F.3d 865 (10th Cir. 2017).  The Tenth Circuit began its standing analysis there with the sufficiency of plaintiffs' allegations to bring a RICO claim—and not with the question whether plaintiffs' allegations adequately established Article III standing.  *See Safe Streets*, 859 F.3d at 881, 885–91.  Article III standing requires a plaintiff to show:  (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted).

The third element of the Article III standing test is not particularly difficult to allege, at least not to survive a motion to dismiss.  But RICO's standing requirement effectively encompasses the first two Article III standing requirements.  *See Safe Streets*, 859 F.3d at 881; 18 U.S.C. § 1964(c).  Namely, at the motion to dismiss stage, plaintiffs adequately must plead that:  (1) their business or property was injured; and (2) that the defendants' violation caused plaintiffs' injury.  *Safe Streets*, 859 F.3d at 881.  The court thus applies the Tenth Circuit's reasoning in *Safe Streets* to determine whether plaintiffs have pleaded sufficient facts to establish that they have both Article III standing and RICO standing.

## III.    Analysis

Because plaintiffs have tailored their allegations to replicate those made by the *Safe Streets* plaintiffs, the court first summarizes that case and the Circuit's rationale for reversing the district court's order that dismissed the case.

A.  *Safe Streets*

*Safe Streets* involved a suit by an organization who alleged a marijuana manufacturer—licensed by the state of Colorado and Pueblo County, Colorado—had "injured . . . adjacent property" owned by two members of the organization.  859 F.3d at 876–77, 879.  Though the landowners did not live on the adjacent land, they alleged that they "often visit[ed] the property on weekends with their children to ride horses, hike, and visit with friends in the closely-knit neighborhood."  *Id.* at 879 (internal quotations omitted).

Plaintiffs alleged two types of harm.  First, "the publicly disclosed drug conspiracy itself . . . injured the value of [their] property."  *Id.* (internal quotations omitted).  Plaintiffs alleged that "the large quantity of drugs at marijuana grows purportedly makes [plaintiffs] targets for theft, and a prospective buyer of the . . . land would reasonably worry that the . . . marijuana grow increases crime in the area."  *Id.* (internal quotations omitted).  And second, the "operation has repeatedly caused a distinctive and unpleasant marijuana smell to waft onto [plaintiffs'] . . . property," making it "less suitable for recreational and residential purposes[,] . . . interfer[ing] with the [landowners'] use and enjoyment of their property, and diminish[ing] the property's value."  *Id.* at 879–80 (internal quotations omitted).

The Circuit's analysis began by discussing whether plaintiffs had alleged a sufficient injury to establish standing under RICO.  "To maintain a cause of action under [RICO]," the Circuit explained, "a plaintiff must plead and ultimately prove:  (1) that the defendant violated [18 U.S.C.] § 1962; (2) that the plaintiff's business or property was injured; and (3) that the defendant's [RICO] violation is the cause of that injury."  *Id.* at 881.  By "plausibly alleging a reduction in land value," the Circuit held, plaintiffs sufficiently had "plead[ed] a property injury under RICO."  *Id.* at 887.  In other words, plaintiffs had "aver[red] that *today* their land is worth

less than it was before, and that this diminution in value occurred *because* their new neighbors began their endeavors." *Id.* (second emphasis added). The Circuit held that RICO's standing principles did not require plaintiffs to plead that they had tried to sell their land, or even appraise it. Instead, the Circuit drew a "common-sense pleading-stage inference that nuisances diminish the value of land." *Id.* The Circuit also concluded it was plausible that "because a crime syndicate [was] publicly violating federal law adjacent to their property, that land [currently was] less valuable." *Id.* at 888.

The Circuit also discussed RICO's causation requirement. Namely, the statute requires RICO plaintiffs to plead plausible allegations that defendant's RICO violation was both the "but for cause" and the proximate cause of plaintiff's injury. *Id.* at 889. The Circuit and the United States Supreme Court have explained this causation requirement in the following way: "'When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.'" *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). In *Safe Streets*, "no complex, external facts [were] at play, as the enterprise [was] the direct source of all of the alleged injuries to the [landowners'] land." *Id.* at 891. Or, to put it differently, the landowners' injuries were "*direct* byproducts of the location and manner" of the defendants' alleged violations. *Id.*

The Circuit concluded that plaintiffs had alleged plausible injuries directly caused by defendants' purported RICO violation. It thus held that plaintiffs had standing to bring their RICO claim and reversed the order dismissing plaintiffs' complaint.

**B. Plaintiffs' Standing Here**

FCA US argues that the Fourth Amended Complaint at issue here is different because it merely speculates that plaintiffs' vehicle may have a defective wire harness. Defendants note

13

that the Fourth Amended Complaint never actually alleges that plaintiffs' vehicle contains a defective harness. And, because plaintiffs have not pleaded that their vehicle has shown any manifestations of the defect alleged by the pleading, FCA US asserts, they have failed to satisfy Article III's standing requirement of an injury-in-fact. *See* Doc. 101 at 20–21 (citing *Clapper*, 568 U.S. at 410–14). Plaintiffs' allegation that they were deprived of $550 of their vehicle's value—defendants argue—is not "fairly traceable" to FCA US's "purported fraud[,] . . . *i.e.*, promising 'parts' to 'permanently fix' a wire harness years" after purchase. Doc. 112 at 8.

ZF NA's contentions are similar. Like FCA US, defendant ZF NA contends that plaintiffs' allegations of diminished vehicle value are insufficient to establish standing. And plaintiffs "would have incurred" expenses while taking their car to a dealership for repairs "regardless of the supposed 'sham recall,'" it asserts. Doc. 103 at 18. Finally, ZF NA contends, plaintiffs' allegation that their vehicle contains a defective part rests on: (1) a recall notice that they and the owners of around 320,000 other affected vehicles received; and (2) the expert opinion plaintiffs described in their allegations. But, ZF NA argues, plaintiffs don't assert that their purported expert ever evaluated plaintiffs' vehicle. Doc. 113 at 9; *see also* Doc. 95 at 21–25.

Plaintiffs respond, first arguing that the "standing bar" adopted in *Safe Streets* "is relatively low"—the *Safe Streets* plaintiffs "merely alleged amorphous, speculative damages to their property value." Doc. 110 at 41. Plaintiffs read *Safe Streets* to hold that they need not "prove a property loss caused by the RICO violation," or demonstrate any kind of a "'concrete financial loss' [to establish] standing." *Id.* at 42 (quoting *Safe Streets*, 859 F.3d at 888). All 320,000 affected vehicles that were recalled are defective, plaintiffs contend. And plaintiffs, as

vehicle owners who received the recall notice, sustained economic damages because "they did not receive the 'parts' or 'permanent remedy' they were promised." *Id.* at 43.

Finally, plaintiffs offer two cases where, they say, federal district courts in California and Michigan recognized that damages analogous to the ones plaintiffs claim here sufficed to establish standing. Specifically, plaintiffs assert that they—like the plaintiffs in the California case—"'have identified a particular, reasonably narrow range by which they allegedly overpaid for the[ir] . . . [v]ehicle.'" *Id.* at 44 (quoting *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 951 (N.D. Cal. 2018)). And the Michigan court, plaintiffs contend, has held that plaintiffs don't need to allege a defect when proceeding on a mail fraud theory under RICO because "damages have already been inflicted equally to all class members . . . at the moment the fraud was finalized." *Id.* at 45 (citing *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1071–72 (E.D. Mich. 2018)).

Plaintiffs' Fourth Amended Complaint attempts to follow the injury-in-fact and causation allegations that the Tenth Circuit found sufficient to establish RICO standing in *Safe Streets*. But the factual allegations in the Fourth Amended Complaint do not match the *Safe Streets* allegations to the extent plaintiffs claim. The court's analysis divides plaintiffs' alleged damages into two categories: (1) out-of-pocket expenses; and (2) economic losses. The next two subsections discuss them.

### 1. Out-of-pocket expenses

Plaintiffs assert that their damages include: (1) "reasonable compensation for their time, mileage, and transportation costs associated with having the physical repair properly performed on their vehicles"; and (2) "reasonable compensation for every prior visit to a dealership necessitated by the defects in the [w]ire [h]arness[,] . . . including the costs and time associated

with having the sham software recall performed." Doc. 95 at 55. Relevant to the facts of their actual experience with their Jeep Cherokee, plaintiffs assert that, "[b]eginning sometime in 2015, [they] began having an increasing number of problems" in their Cherokee. *Id.* at 26. Then, after receiving the recall notice, and sometime around December 2016, plaintiffs scheduled a service appointment at their dealership in Lee's Summit, Missouri, to have the recall repair performed on their vehicle around December 2016. Plaintiffs allege that they incurred out-of-pocket expenses to travel to the dealership and spent time and gas money doing so. At some unspecified time later, plaintiffs allege that their vehicle wouldn't start, so they had it towed to a different dealership in Kansas.

While the Fourth Amended Complaint certainly alleges that plaintiffs have incurred out-of-pocket costs, they have not pleaded that these expenses are "*direct* byproducts" of defendants' alleged RICO violation—*i.e.*, providing a software update instead of replacing the wire harness. Plaintiffs' allegations never connect the alleged RICO scheme to the damages they allege: they don't assert that the initial "number of problems" with their vehicle or its failure to start resulted from the software update, or even from a defective wire harness. *Id.* In fact, the Fourth Amended Complaint alleges that plaintiffs didn't learn about the software update that their vehicle received until they already had arrived at the second dealership they visited. *See id.* at 27. In short, plaintiffs have not drawn a direct line—as *Safe Streets* requires—between defendants' alleged RICO violation and their expenses. Instead, plaintiffs merely have alleged a timeline that includes unidentified problems with their vehicle, *i.e.*, it wouldn't start. And plaintiffs' Fourth Amended Complaint never alleges that defective wire harnesses caused problems with vehicles' ability to start. These generalized allegations don't satisfy the causation requirement for RICO standing formulated by the Tenth Circuit.

The court thus concludes that plaintiffs have not alleged injuries in the form of out-of-pocket expenses that can be traced to defendants' alleged RICO violations.

### 2. Economic losses

The second category of damages alleged by plaintiffs relies on economic losses. But plaintiffs' characterization of these losses varies slightly between one portion of the Fourth Amended Complaint and another. First, plaintiffs assert that they directly have lost $550 as of the day the Fourth Amended Complaint was filed, "either by [the] need to pay out of pocket to have the wire harness in their vehicle removed to replace it [or] determine if the defect exists." *Id.* at 18. Also, plaintiffs allege the vehicle's value has diminished because of uncertainty whether their vehicle has a defective wire harness. But, several pages later, plaintiffs assert that they have been "deprived of the value of their vehicle[] by being sold [a] defective vehicle[] . . . [and] not having a real recall and a proper part replacement." *Id.* at 55. They seek to recover damages for the diminished value of their Jeep Cherokee because of the defective wire harness and insufficient software update.

Plaintiffs argue that, to plead a RICO claim, *Safe Streets* doesn't require them to allege that their property has diminished in value. *See* Doc. 110 at 42; *Safe Streets*, 859 F.3d at 888 (holding that plaintiffs need not "cite statistics, appraisals, attempts to sell, or other concrete evidence to quantify their concrete financial loss with actual facts" (internal quotations omitted)). But the *Safe Streets* plaintiffs had alleged that odors from defendants' neighboring property, where marijuana grew, and defendants' operation of an enterprise openly violating federal law directly had caused their property's value to decline. So, the *Safe Streets* plaintiffs did not merely allege "amorphous, speculative damages to their property value." *See* Doc. 110 at 41.

They asserted specific circumstances—*i.e.*, odors and defendants' openly criminal activity—to make plausible allegations that their property's value had declined.

Here, the Fourth Amended Complaint only alleges that plaintiffs' vehicle has a defect based on a recall notice they received. And, even if plaintiffs' vehicle has the defect plaintiffs assume it has, they fail to connect defendants' alleged RICO violation—a "sham" software update—and the diminished value of that vehicle. As discussed above, plaintiffs haven't pleaded facts showing that the problems they experienced with their vehicle are traceable to defendants' "sham" software update. Plaintiffs also assert that public information about the recall and their lawsuit has affected the value of their vehicle. But this relationship is more attenuated than the relationship that the *Safe Streets* plaintiffs alleged—there, defendants were operating an open criminal enterprise next door to plaintiffs' property.

Plaintiffs haven't pleaded facts in their Fourth Amended Complaint that replicate the facts alleged in *Safe Streets*, *i.e.*, factual allegations about odors actually having travelled onto plaintiffs' property and an open criminal enterprise diminishing their property's value. The Tenth Circuit did not require the *Safe Streets* plaintiffs to quantify or plead fact-specific allegations about an actual amount of property losses. But those plaintiffs specifically alleged that smells and activities on the neighboring property actually had affected plaintiffs' use of their land. Here, in an effort to follow *Safe Streets*, plaintiffs quantify their economic losses and argue that they don't need to prove their vehicle's value declined to withstand a motion to dismiss. But plaintiffs merely assert the conclusion that they are affected economically by defendants' failure to replace their defective wire harness. Plaintiffs never allege any facts demonstrating *how* they are affected. *Safe Streets*—and its "narrow holdings"—explains that RICO's civil remedy standard is a "heavily fact-dependent" one. *See* 859 F.3d at 891. Here, plaintiffs only have

alleged, at best, a tenuous connection between defendants' purported RICO violation and the decreased value of their Jeep Cherokee. This tenuous connection falls short of the facts pleaded in *Safe Streets*.

Finally, plaintiffs rely on *In re Chrysler-Dodge-Jeep* and *In re Duramax* as persuasive authority that their alleged damages suffice to establish standing. But the allegations in those cases differ from ones made here. Plaintiffs in those two cases alleged that they had overpaid for their vehicles. But they didn't just assert that their vehicles had diminished in value. *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 949 ("Whether the value of the Class Vehicles has dropped is not Plaintiffs' focus. . . . Plaintiffs contend that they overpaid for the Class Vehicles."); *In re Duramax*, 298 F. Supp. 3d at 1052 ("Plaintiffs' overpayment theory suffices to provide standing to sue GM[.] . . . Accepting Plaintiffs' allegations as true, they paid a premium for a 'clean diesel' vehicle which actually polluted at levels dramatically higher than a reasonable consumer would expect.").

In contrast, here, plaintiffs do not advance the same "overpayment" damages claim. They also don't assert that they "would not have purchased" their vehicle, "or would have paid less for it," but for defendants' actions. *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 945. Instead, the Fourth Amended Complaint asserts that plaintiffs have been deprived of the value of the vehicle, and they have incurred damages in the form of diminished value as of the date they brought their claims. Unlike *Chrysler-Dodge-Jeep* and *Duramax*, plaintiffs have not alleged that they already have paid for a benefit to their vehicle—*i.e.*, emissions reduction technology or some other specific feature—that they never received.

Thus, plaintiffs have not alleged injuries in the form of out-of-pocket expenses that one plausibly can trace to defendants' alleged RICO violations. Also, plaintiffs only have pleaded a

tenuous connection between defendants' purported RICO violation and the decreased value of their Jeep Cherokee. And plaintiffs have not alleged that they overpaid for their Cherokee, or for any specific feature. The court thus concludes that plaintiffs have not alleged sufficient damages—both in the form of out-of-pocket expenses and economic losses—to satisfy the standing requirement established by *Safe Streets*.

## IV.    Conclusion

The Fourth Amended Complaint fails to plead facts plausibly alleging standing sufficient to assert a RICO claim. Often, the court permits plaintiffs to amend inadequate allegations to assert—if they rightfully can do so—a plausible claim for relief. But here, arguably, the circumstances call for a different outcome. Plaintiffs already have had two chances to plead and replead a plausible claim. Both times, they have responded with inadequate allegations. In some respects, it appears that plaintiffs are prospecting for words that will substitute for the requisite injury to their business or property, as RICO requires. But, the court also is aware that defendants declined to participate in a procedure that could have revealed whether plaintiffs' vehicle contains a defective harness. *See* Doc. 83.

Though it is a close call, the court, in its discretion, will grant plaintiffs leave to replead their RICO claim. Plaintiffs must file a Fifth Amended Complaint within **14 days of this Order's date**. If plaintiffs do not file a Fifth Amended Complaint, defendants FCA US and ZF NA may renew their motions and adopt the memoranda supporting the current motions (Docs. 100 & 102), and the court would grant those motions. For now, however, the court denies FCA US's Motion to Dismiss (Doc. 100) and ZF NA's Motion to Dismiss (Doc. 102).

**IT IS THEREFORE ORDERED BY THE COURT THAT** unless plaintiffs file a Fifth Amended Complaint within **14 days of the date of this Order**, the court will grant

renewed motions to dismiss filed by defendant FCA US, LLC, and defendant ZF North America, Inc.

**IT IS FURTHER ORDERED THAT** defendant FCA US, LLC's Motion to Dismiss (Doc. 100) and defendant ZF North America, Inc.'s Motion to Dismiss (Doc. 102) are denied.

**IT IS SO ORDERED.**

**Dated this 29th day of March, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
