# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

RONALD AND MELODY LAROE,
individually, and on behalf of those
similarly situated,

     Plaintiffs,

v.

    Case No. 17-2487-DDC-JPO

FCA US, LLC
f/k/a CHRYSLER GROUP, LLC, et al.,

     Defendants.

## MEMORANDUM AND ORDER

     This matter comes before the court on defendants FCA US, LLC ("FCA US," f/k/a

Chrysler Group), and ZF North America, Inc.'s ("ZF NA") Motions to Dismiss (Docs. 124 and

128). Plaintiffs Ronald and Melody LaRoe, individually, and on behalf of those similarly

situated, have filed their Fifth Amended Complaint (Doc. 121) in this case. This filing—like its

many predecessors—alleges that defendants acted in concert to defraud owners of some 320,000

vehicles manufactured by FCA US. Specifically, plaintiffs allege that defective wire harnesses

were installed in some—but not all—FCA US-manufactured vehicles. And, plaintiffs allege,

defendants conducted a "sham recall" to avoid the cost of replacement parts. The Fifth Amended

Complaint largely resembles the Fourth Amended Complaint, except that it now pleads that

plaintiffs overpaid for their vehicle when they purchased it in 2014. As they argued in earlier

Motions to Dismiss (Docs. 42, 62, 100, and 102), defendants contend that plaintiffs lack standing

to assert the single cause of action they plead. *See* Doc. 125 at 12–15; Doc. 129 at 8–14.

     For reasons explained below, the court again concludes that plaintiffs lack standing to

bring the RICO claim asserted in their Fifth Amended Complaint. This time, however, the court

declines to permit plaintiffs to replead yet again. After four tries, plaintiffs never have satisfied the requisite of Article III standing. Given the sophistication of plaintiffs' counsel, and the many opportunities plaintiffs have had to plead this requisite satisfactorily, the court concludes that plaintiffs, could they do so, would have pleaded facts sufficient to establish standing. They still have not done so. The court thus dismisses the action without prejudice.

## I.    Background

This section briefly summarizes the procedural history culminating in plaintiffs' Fifth Amended Complaint. Then, it outlines the Fifth Amended Complaint's alleged facts pertinent to the court's analysis of plaintiffs' standing to assert their RICO claim.

### A.  Procedural History

Plaintiffs filed their Second Amended Complaint (Doc. 41) after the court granted their unopposed Motion seeking leave to file an amended complaint. *See* Docs. 39 & 40. FCA US and ZF NA both filed Motions to Dismiss (Docs. 42 & 62), arguing, in part, that plaintiffs lacked standing to bring their claims and thus they moved to dismiss the claims, in part, under Federal Rule of Civil Procedure 12(b)(1).

The court agreed with defendants' motions. The Second Amended Complaint hadn't asserted that plaintiffs had sustained any damages arising from the malady that the allegedly defective wire harness could cause—*i.e.*, an unexpected shift in gear that "could" cause a collision. *See* Doc. 41 at 9 (internal quotations omitted). Also, the Second Amended Complaint didn't allege any problems with plaintiffs' car that were "'fairly trace[able]'" to defendants' conduct. Doc. 85 at 14 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). The court also rejected plaintiffs' argument that their injury included the diminished value of their vehicle. *See id.* at 16 (citing *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d

962, 972–73 (C.D. Cal. 2014)).  Plaintiffs failed to plead that the allegedly defective part in their vehicle did not work, or any other fact "that plausibly demonstrate[d] any diminished value in their vehicle[ ]."  *Id.*  *Tae Hee Lee* had held that plaintiffs "failed to plead the required 'something more' than alleged overpayment for their [vehicle]."  *Tae Hee Lee*, 992 F. Supp. 2d at 973.  Finding *Tae Hee Lee*'s reasoning persuasive, the court applied its analysis to the Second Amended Complaint.

But the court granted plaintiffs leave to file another amended complaint.  They did so again, but, the court concluded that plaintiffs' Fourth Amended Complaint[1] was defective.  The court held that the fourth iteration of the Complaint had "fail[ed] to plead facts plausibly alleging standing sufficient to assert a RICO claim."  Doc. 119 at 19.  Specifically, plaintiffs had failed to "allege injuries in the form of out-of-pocket expenses that one plausibly can trace to defendants' alleged RICO violations."  *Id.*  And, the pleaded connection between any alleged RICO violation and plaintiffs' vehicle value was "tenuous."  *Id.*  But, the court granted plaintiffs one last chance to amend their Complaint to assert an actionable claim.  *Id.* at 2.

Plaintiffs then filed their Fifth Amended Complaint (Doc. 121)—the generation of the Complaint at issue now.  The court summarizes the allegations in the Fifth Amended Complaint in part B, which follows.

### B.  Fifth Amended Complaint

Like the Fourth Amended Complaint, the Fifth Amended Complaint asserts a RICO violation—in the form of a "sham recall" to avoid part replacement costs—and identifies economic loss as plaintiffs' only injury.  The court's earlier orders have recited the facts in detail

---

[1]    Plaintiffs also filed a Third Amended Complaint, but quickly notified the court that it was filed in error.  Doc. 94.  The court granted leave to file an amended complaint replacing the inadvertently filed one, which became the Fourth Amended Complaint.  Doc. 95.

and there's no need to do so again here. *See* Doc. 85 (Memorandum and Order dated June 25, 2018); Doc. 119 (Memorandum and Order dated March 29, 2019). Instead, the court briefly summarizes the pertinent facts from the Fifth Amended Complaint. When it considers defendants' motions to dismiss, the court accepts, of course, the facts asserted by the Fifth Amended Complaint (Doc. 121) as true and views them in the light most favorable to plaintiffs. *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). But this acceptance of plaintiffs' version of the facts does not require the court to accept legal conclusions or similar rhetoric. *Carter v. United States*, 667 F. Supp. 2d 1259, 1263 (D. Kan. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### 1. Allegations about all affected vehicles

During model years 2014 to 2016, the Fifth Amended Complaint alleges, FCA US manufactured at least 320,000 cars and SUVs with defective sensor wire harnesses (collectively, the "affected vehicles"). Doc. 121 at 1, 5. The wire harness at issue is a component within the nine-speed transmission of the affected vehicles. *Id.* at 9. It ultimately controls which gear the automatic transmission selects, and when it selects that gear. *Id.* The Fifth Amended Complaint alleges that the wire harnesses are defective because they were manufactured with insufficient wiring crimps. These crimps hold a group of wires together snugly in a harness and thus maintain conductivity and connectivity. *Id.* A wiring crimp defect, plaintiffs allege, can cause electrical resistance to become too great; if that happens during normal operation, a vehicle's transmission can shift suddenly into neutral.

The Fifth Amended Complaint also alleges that ZF NA knew the root cause of the defect by July 10, 2014, and FCA US knew about the defect "well before" July 2016. *Id.* at 5. In July

2016, FCA US submitted a Safety Recall Report to National Highway Traffic Safety Administration ("NHTSA") under 49 C.F.R. Part 573. [2] *Id.* at 13, 13 n.14. In this report, FCA US informed NHTSA that "'[s]ome . . . vehicles may have insufficient crimps in the transmission wire harness that may cause an unexpected shift to neutral resulting in a sudden loss of motive power.'" *Id.* at 13 (quoting FCA US's Initial 49 C.F.R. Part 573 Report to NHTSA, submitted on July 12, 2016) (ellipsis in original).[3] Also, the report from FCA US explained, "'[T]he remedy program for this recall is under development.'" *Id.* at 14 (quoting Part 573 Report). FCA US included a draft Recall Notice with its Safety Recall Report.

In 2016, FCA US sent the Recall Notice to owners of the affected vehicles. This notice described the wire harness problem this way:

> The transaxle wire harness on your vehicle may have been built with insufficient wire terminal crimp(s). This may cause an intermittent high electrical resistance in the transaxle wire harness circuit(s). A high resistance circuit(s) in this wiring harness will cause the on-board diagnostic system to set a Diagnostic Trouble Code (DTC). When the DTC is set, the system defaults the transaxle to neutral and the customer experiences a loss of motive power. Motive power can usually be regained upon a restart. The loss of motive power could cause a crash without warning.

*Id.* at 14 (quoting Interim Recall Notice for Safety Recall S55/NHTSA 16V-529 [hereinafter "Interim Recall Notice"]) (internal quotation marks omitted). FCA US's Recall Notice also explained that:

> FCA [US] intends to repair your vehicle free of charge (parts and labor). However, the parts required to provide a permanent remedy for this condition are currently not available. FCA [US] is making every effort to obtain these parts as quickly as possible. FCA [US] will contact you again by mail, with a follow-up recall notice, when the remedy parts are available.

---

[2]    The Fifth Amended Complaint alleges that FCA US likely knew about the defect "significantly earlier" than when it informed NHTSA of the problem. Doc. 121 at 5.

[3]    For simplicity, this Order calls FCA US's report to NHTSA the "Part 573 Report."

*Id.* at 13 (quoting Interim Recall Notice) (emphasis in original) (internal quotation marks omitted).

Plaintiffs allege, however, that FCA US never truly intended to provide a "permanent remedy" for the defective wire harnesses in all 320,000 vehicles. *Id.* at 15. Also, plaintiffs allege, FCA US knew that it had no such intention when it issued its Recall Notice in 2016. Instead, plaintiffs allege, defendants performed a software update that failed to cure the defect or its manifestations.

Plaintiffs allege that FCA US instructed its dealers—in lieu of replacing the defective harnesses in all vehicles—to update the affected vehicles' powertrain and transmission software modules unless a DTC—diagnostic trouble code[4]—revealed that the vehicle had suffered a loss of motive power, as shown by an active or stored fault code. FCA US estimated that just 5% of affected vehicles would register a DTC showing the vehicle actually had experienced a loss of motive power. *Id.* at 16 n.21. And, for those vehicles where a DTC registered a loss of power, the dealer then would replace the defective wire harness. Also, an ordering limitation was in place to manage part availability. The Fifth Amended Complaint alleges that the reference to "part availability" in FCA US's Interim Recall Notice was false, and that defendants artificially restricted availability so that FCA US could avoid spending money to provide replacement parts. *Id.* at 16.

Later, FCA US sent another notice letter to owners of affected vehicles. This notice letter mentioned that FCA US would use a software update as part of its recall. But, FCA US never explained that the update omitted a physical repair of the defective wire harness. *Id.* at 17.

---

[4]     While the Fifth Amended Complaint never alleges what a DTC is, the context of plaintiffs' reference to a "DTC" suggests it is the way a vehicle notifies the driver (or mechanic) about an issue. *See* Doc. 121 at 16 n. 21, 19, 53.

In sum, the Fifth Amended Complaint alleges that the software update merely changed the way the defect manifested itself. But, plaintiffs allege, the software update didn't actually fix the defect. Specifically, the software update forced the car to shift unexpectedly into "'fixed-gear limp mode.'" *Id.* (quoting Dealer Service Instructions at 2). The Fifth Amended Complaint also alleges that FCA US never informed NHTSA, dealers, or the owners of the affected vehicles about this mode. Plaintiffs also allege FCA US never explained how vehicle owners could drive in fixed-gear limp mode. And, FCA US also did not explain which gear the vehicle would select for fixed-gear limp mode. More to the point, FCA US did not explain whether the car always would select the same pre-determined gear out of the nine available forward speeds or, instead, simply would select the last gear the transmission had used before the fault occurred. *Id.* at 18.

The Fifth Amended Complaint again alleges that plaintiffs have consulted a putative expert witness, Marthinus van Schoor.[5] They allege that Mr. van Schoor's qualifications and opinions support their assertion that defendants' software update did not eliminate the defect in the affected vehicles. According to the Fifth Amended Complaint, Mr. van Schoor opined that FCA US's software update—and the fixed-gear limp mode it triggers—"does not fix the safety related aspect of [the] defect." *Id.* at 25. To put it another way, the affected vehicles receiving

---

[5]     Other courts have allowed plaintiffs to plead opinions from purported experts in complaints while reserving until later the duty to rule on evidentiary issues about the expert opinions. *See, e.g.*, *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004) ("[P]ersonal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000))); *In re Resonant Inc. Secs. Litig.*, No. 15-1970 SJO (VBKx), 2016 WL 6571267, at *5 (C.D. Cal. July 11, 2016) (concluding that "expert testimony is not barred from being plead[ed] directly into a complaint" and "assum[ing], under Federal Rule of Civil Procedure 12(b)(6), that the expert opinions referenced in the [complaint were] true, without prejudice to addressing the admissibility of the expert testimony in a *Daubert* motion filed before trial"). While the court assumes the truth of plaintiffs' allegations about Mr. van Schoor's opinions, these alleged opinions do not persuade the court that plaintiffs have alleged sufficient facts to establish standing. *See infra* Part III.B.2.

the software update still could crash without warning because they still could shift into fixed-gear limp mode. Thus, Mr. van Schoor opines, the only way to remedy the defect is to replace the defective wire harness. *Id.* at 26.

Plaintiffs allege that defendants' software update deceived consumers into believing that defendants had provided a permanent remedy for their vehicles' defect. And, based on their publicly visible lawsuit and other public documents, plaintiffs assert that the value of each affected vehicles has decreased by the amount it costs to repair each vehicle permanently—*i.e.*, the cost of replacing the defective wire harness. Plaintiffs allege the replacement will cost $550 per car.[6] Plaintiffs also allege they paid "more than they would have" paid for their vehicle "had they been told that their cars had a defective wire harness." *Id.* at 6.

The Fifth Amended Complaint alleges that plaintiffs have sustained several types of economic loss, including: (1) "overpayment damages" resulting from plaintiffs paying for a "functioning wire harness" they did not receive; (2) $426.30 in direct losses plaintiffs paid to replace the wire harness in their vehicle; (3) reasonable compensation for time, mileage, and transportation costs incurred to replace the wire harness; and (4) reasonable compensation for every visit to a dealership they had to make because of the defective wire harness in their vehicle, including time and costs devoted to the software update installed in it. *Id.* at 7.

---

[6] Specifically, plaintiffs allege that the cost to replace the wire harness in each affected vehicle is about $550 per car. *See* Doc. 121 at 6 n.6. Plaintiffs arrive at this figure based on the following: (1) the wire harness, part number CSVF551AA, or CSFFS552AA, retails for about $80, and the replacement valve body O-Ring Kit part number CSVFS555AA sells for about $5; (2) three quarts of automatic transmission fluid part number 68218925AA sells for about $30 per quart, for a total of $90; and (3) the 2.7 to 3.0 hours of labor needed can cost about $375 (depending on local rates charged by FCA US dealers where consumers live).

### 2. Allegations specific to plaintiffs' Jeep Cherokee

On August 9, 2014, or thereabout, plaintiffs purchased a brand-new 2014 Jeep Cherokee from a full-service FCA US dealership. "[A]round" December 2016, after receiving the recall notice from FCA US, plaintiffs scheduled a service appointment at their dealership. *Id.* at 27. No later than December 5, 2016, plaintiffs understood that their dealership had performed the recall work on their Jeep Cherokee. Plaintiffs allege that they incurred out-of-pocket costs, time, and "gas money" to travel to the dealership for the repairs. *Id.*

After performing the recall work, plaintiffs' dealership told them it had performed the repairs as needed under Safety Recall S55/NHTSA 16V-529 and, in lay terms, had "fixed" their Jeep Cherokee. *Id.* at 28. Sometime later—on a date not specified by the Fifth Amended Complaint—plaintiffs' Jeep Cherokee would not start.[7] So, plaintiffs had it towed to a different dealership—this time, a dealership in Kansas. There, plaintiffs learned that the dealership they previously had visited—they alleged their earlier trip was made to a dealership in Lee's Summit, Missouri—had performed a software update on the Jeep Cherokee. But the Missouri dealership had not replaced the wire harness in their vehicle.

Plaintiffs allege that their Jeep Cherokee "carries the same defect" described in the recall documents. *Id.* at 29. Specifically, they assert, their vehicle was manufactured with a defective wire harness. But at the same time, plaintiffs allege that they don't know which of the vehicles covered by the recall notice will manifest problems caused by the defective wire harnesses. They also allege that they lack this knowledge because defendants didn't track the defective vehicles. Because defendants sent the recall notice to all owners of affected vehicles, plaintiffs

---

[7]     Plaintiffs no longer allege that their Jeep Cherokee's failure to start had a connection to the wire harness's alleged defects. Doc. 121 at 28. And, they do not allege their vehicle ever has shifted unexpectedly into "limp gear mode" or otherwise exhibited a symptom of a defective wire harness.

assert that the "defect applies to 100%" of the affected vehicles.[8] *Id.* at 21. And plaintiffs allege, to rule out a defect, FCA US would have to identify, remove, and inspect the wire harness in each affected vehicle.

Plaintiffs allege that they attempted to arrange to replace the defective part in their vehicle—and at their own cost. *Id.* at 29. But defendants purportedly "obstructed [their] efforts" without a good faith basis. *Id.* Specifically, plaintiffs "sought the assistance of the [c]ourt." *Id.* In an Order in this case, Magistrate Judge O'Hara notified plaintiffs that neither the court nor defendants was preventing plaintiffs from replacing the part in their Jeep Cherokee if they believed they could do so without evidence spoliation. Doc. 83. But, this Order also informed plaintiffs that, if they replaced the part, they might have to defend a motion accusing them of evidence spoliation. Judge O'Hara's Order followed plaintiffs' "informal request" for a status conference. *See id.*

On April 1, 2019, plaintiffs contacted Reed Jeep—an authorized FCA US dealership—to replace the wire harness in their Jeep Cherokee. A Reed Jeep employee advised plaintiffs that "all open recalls had been performed," but nevertheless plaintiffs had the wire harness in their Jeep Cherokee removed and replaced on April 4, 2019. Doc. 121 at 31. Plaintiffs contend they "have retained the defective wire harness that was removed by the Fiat-Chrysler dealership and will make it available for inspection by [d]efendants at a time, place, and according to protocols that are mutually agreed upon." *Id.* Plaintiffs allege they incurred costs of $426.36 to replace their wire harness. *Id.* at 32. Plaintiffs allege most of this cost was necessary "whether [their]

---

[8]     Defendants challenge plaintiffs' claim that the alleged defect "applies to 100%" of the affected vehicles. Defendants assert that just 5% of the affected vehicles ever will manifest a problem resulting from the defect. Defendants never explain the basis for this 5% assertion, an omission that doesn't matter because the court must accept plaintiffs' version of the facts.

Jeep Cherokee] was actually defective or not" because one cannot determine whether a particular wire harness is defective without conducting a physical inspection. *Id.*

Finally, plaintiffs allege that other consumers have experienced the transmission defect. By June 30, 2016, FCA US had received 3,981 warranty complaints about the wiring harness defect. *Id.* By August 2016, NHTSA had received 661 consumer complaints about the complainants' transmissions in their Jeep Cherokees. *Id.* at 33. Another 130 consumers had complained about transmissions in the Chrysler 200 model. *Id.*

## II. Legal Standard

Defendants move to dismiss this lawsuit under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction because, they assert, plaintiffs have no standing to bring their claim. Their premise is a correct one: Standing to sue is elemental to subject matter jurisdiction. The court thus must resolve this threshold question before expressing any opinion about a case's substance. *See Rivera v. IRS*, 708 F. App'x 508, 513 (10th Cir. 2017) ("Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction that [courts] must address, sua sponte if necessary, when the record reveals a colorable standing issue." (citing *United States v. Ramos*, 695 F.3d 1035, 1046 (10th Cir. 2012))). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted). Since federal courts are courts of limited jurisdiction, there is a presumption against jurisdiction and the party invoking federal jurisdiction bears the burden to show it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Article III standing requires the plaintiff to demonstrate: (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted). At the pleading stage, general factual allegations can carry plaintiffs' burden to establish the elements of Article III standing because the court must "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). "Each plaintiff must have standing to seek each form of relief in each claim." *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007). "At bottom, the gist of the question of standing is whether [plaintiffs] have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007) (citation and internal quotation marks omitted).

Here, plaintiffs assert that they have tried to track the standing analysis applied by the Circuit in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). But the *Safe Streets* analysis focused on the sufficiency of plaintiffs' allegations to assert a RICO claim—it didn't decide whether plaintiffs' allegations adequately established Article III standing. *See id.* at 881, 885–91 (first addressing whether plaintiffs alleged a violation of 18 U.S.C. § 1962(c), then analyzing whether plaintiffs "plausibly pled (1) injuries to their property (2) that were caused by those violations" under the usual pleading standard). The Circuit explained in *Safe Streets* that, given the Supreme Court's holding in *Lexmark International, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 128 n.4 (2014), "'RICO standing' or 'statutory standing'" is not jurisdictional and is "now properly characterize[d] as the usual pleading stage inquiry: whether the plaintiff has plausibly pled a cause of action under RICO." *Id.* at 887. So, to survive a motion to dismiss, RICO plaintiffs adequately must plead that: (1) their business or property was injured; and (2) that the defendants' RICO violation caused plaintiffs' injury. *Safe Streets*, 859 F.3d at 881.

Earlier, in the April 8, 2019 Memorandum and Order, the court applied "the Tenth Circuit's reasoning in S*afe Streets* to determine whether plaintiffs ha[d] pleaded sufficient facts to establish that they have both Article III and RICO standing." Doc. 119 at 11. The court organized its analysis this way because *Safe Streets* started with RICO standing and did not discuss Article III standing separately. *See Safe Streets*, 859 F.3d at 881, 887. Now, after yet another round of briefing in this case, the court is convinced that its earlier view is not entirely correct.

Instead, this Order organizes the analysis around several basic principles. *First*, RICO plaintiffs are like every other party who seeks to sue in federal court. They must establish the court has subject matter jurisdiction to entertain their claim. *Kokkoren*, 511 U.S. at 377. *Second*, subject matter jurisdiction requires Article III standing. *Rivera*, 708 F. App'x at 513. *Third*, if a RICO plaintiff satisfies the first two requirements, it then must hit the marks recognized by "the usual pleading stage inquiry." *Safe Streets*, 859 F.3d at 887 (citing *Lexmark*, 572 U.S. at 128 n.4). That is, it must plead facts demonstrating RICO standing under the *Safe Streets* standard. And *last*, the court does not read *Safe Streets*—explicitly or otherwise—to obviate the need for Article III standing because Supreme Court precedent requires it. *Lujan*, 504 U.S. at 560–61. In short, a federal court may evaluate the substance of a RICO claim only if plaintiff demonstrates

Article III standing.

So, in this Order's analysis of the latest iteration of the Complaint, the court begins with this question: Have plaintiffs discharged their responsibility to establish Article III standing? Concluding that plaintiffs have failed to do so, the court lacks subject matter jurisdiction over their claim. It thus grants defendants' motions and dismisses the case without prejudice.

## III. Analysis

On balance, the Fifth Amended Complaint reasserts the same allegations as the Fourth Amended Complaint. And, the parties also make similar argument about Article III and RICO standing. The court summarizes the parties' arguments about standing in part A, below. Then, in part B, the court considers whether the Fifth Amended Complaint pleads facts sufficient to show they have Article III standing. Finally, in part C, the court summarizes its holding.

### A. Overview of Arguments

Defendant FCA US argues, as before, that plaintiffs lack standing because "[p]laintiffs do not allege . . . that the [w]ire [h]arness in *their* vehicle ever actually had the crimp 'defect,' or that it has ever manifested itself in, or affected the operation of, *their* vehicle." Doc. 125 at 13. FCA US contends that plaintiffs "must allege that their product actually exhibited the defect." *Id.* (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011)). And, FCA US also asserts, plaintiffs' position is "even weaker" than before because plaintiffs report that they now have removed the wire harness from their Jeep Cherokee but failed to inspect it or allege it was defective. *Id.* at 14. Plaintiffs cannot "create their own standing"— FCA US argues—by "voluntarily . . . incur[ing] the cost of replacing their vehicle's [w]ire [h]arness even though it had never manifested any defect." *Id.*

Defendant ZF NA's arguments are similar. Like its co-defendant, ZF NA contends that plaintiffs lack standing and that plaintiffs cannot "manufacture" standing by "incur[ing] costs to replace the [w]ire [h]arness." Doc. 129 at 9. ZF NA asserts the out-of-pocket damages plaintiffs assert are identical to those claimed in the Fourth Amended Complaint. And so, they lack standing for the same reasons the court articulated in its March 29, 2019 Memorandum and Order (Doc. 119). ZF NA also asserts that the economic losses alleged by the Fifth Amended Complaint fail to establish standing because plaintiffs' "'overpayment' allegations are nothing more than their earlier-asserted 'diminished value' allegations, recycled and now characterized as 'overpayment.'" Doc. 129 at 11. And, "[p]laintiffs' 'overpayment' injury . . . has nothing to do with any statements made to NHTSA or consumers in connection with the recall." *Id.* at 12. Thus, according to ZF NA, plaintiffs have not alleged a causal link between their alleged overpayment and a RICO violation. Plaintiffs respond with two principal arguments.

*First*: they argue that only "general allegations" are required to allege standing. Doc. 132 at 41 (citing *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012)). Plaintiffs contend they have met this standard with "overpayment allegations," which satisfy all three prongs of *Lujan*'s standard. Plaintiffs cite two cases from federal district courts in Michigan and California for support. *Id.* (citing *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018) and *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018)). And, plaintiffs remind the court, "RICO is to be read broadly." *Id.* at 40 (quoting *Safe Streets*, 859 F.3d at 881). Plaintiffs contend defendants cannot argue, simultaneously, that plaintiffs were supposed to test their wire harness and that testing is irrelevant to standing. Plaintiffs thus ask the court to "apply the doctrine of judicial estoppel" to

prevent defendant from invoking this argument because defendants declined to participate in testing earlier in the case. *Id.* at 42.

*Second*: Plaintiffs argue that the "standing bar" adopted in *Safe Streets* "is relatively low." *Id.* at 45. Plaintiffs claims that the *Safe Streets* plaintiffs "merely [had] alleged amorphous, speculative damages to their property value." *Id. Safe Streets*, plaintiffs assert, holds that they didn't need to sell or appraise their Jeep Cherokee to demonstrate a redressable loss of a property interest. In a related vein, plaintiffs say that "the recall itself establishes the existence of a defect." *Id.* at 47. The real issue, in plaintiffs' view, is "whether the recall that was ordered to cure the defect was performed legitimately or fraudulently . . . ." *Id.*

Below, in part B, the court evaluates some of the parties' standing arguments. The court's analysis, however, approaches the question differently than plaintiffs or defendants. Their briefs merge Article III and RICO standing. But, as explained above, the court views these requirements as distinct from one another. That is, RICO plaintiffs first must demonstrate that they have Article III standing. And because Article III standing is an essential component of the court's subject matter jurisdiction, the court begins with it.

## B. Article III Standing

The court organizes its Article III standing around the three requirements recognized by the Supreme Court in *Lujan*. The first requirement—considered in subpart 1, below—asks whether plaintiffs have alleged an "injury in fact." 504 U.S. at 560. Concluding that the Fifth Amended Complaint has alleged such an injury, subpart 2 focuses on the next component of *Lujan*'s analysis: the requirement of "a causal connection between the injury and the conduct complained of . . . ." *Id.* Because the court concludes that plaintiffs have failed to plead a causal connection, the court need not address the last of *Lujan*'s three requirements: redressability.

### 1. Have plaintiffs alleged a concrete injury?

Plaintiffs allege two broad forms of loss that, they contend, qualify as an "injury in fact—that is, an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent [and] not conjectural or hypothetical . . . ." *Id.* (citations and internal quotations omitted).

They call the first one "overpayment damages." Doc. 121 at 6 (Fifth Am. Compl. ¶ 19). The Fifth Amended Complaint characterizes the overpayment damages different ways. For one, plaintiffs alleged they overpaid for their Jeep Cherokee "by paying more than they would have [paid] had they been told that their cars[9] had a defective wire harness." *Id.* Elsewhere, the Fifth Amended Complaint alleges each owner of an affected vehicle has sustained a "diminution of value" because its uncertain whether that owner's vehicle contains a defective harness. *Id.* at 20 (Fifth Am. Compl. ¶ 74).

The second category of loss alleged is fairly categorized as out-of-pocket costs that plaintiffs have incurred because of the wire harness problem. These out-of-pocket costs include: (a) "the actual amount of money plaintiffs paid to have their wire harness replaced with a genuine replacement part ($426.30, plus sales tax);" (b) plaintiffs' "mileage (out of pocket damages that are quantified by an official mileage rate) for having the physical repair (effectively, the genuine recall) properly performed on their vehicles;" and (c) "reasonable compensation for every prior visit to a dealership necessitated by the defects in the Wire Harness . . . ." *Id.* at 7.

As a matter of law, some of plaintiffs' out-of-pocket damages can't carry the "injury in fact" burden. Binding precedent from our Circuit requires the court to decide standing based on

---

[9]    The Fifth Amended Complaint uses the plural noun "cars" in this passage, but, as a whole, it is evident that the Fifth Amended Complaint alleges plaintiffs purchased just one car.

the state of play when plaintiffs failed their original Complaint. *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (holding that "standing is determined at the time the action is brought . . ." (quoting *Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007)). This holding amplifies the principle recognized by the Supreme Court in *Friends of the Earth, Inc. v. Laidlaw Environmental. Services (TOC), Inc.*, 528 U.S. 167, 168 (2000). Specifically, standing is judged "at the outset of the litigation." *Id.* This is so even when—as here—plaintiffs amend their Complaint to allege facts occurring after the original complaint was filed. *S. Utah. Wilderness Alliance*, 707 F.3d at 1153 ("When the original complaint has been superseded by an amended complaint," standing still is decided based on events existing "when the complaint was first filed").

This rule nullifies plaintiffs' out-of-pocket losses for costs plaintiffs paid to have the wire harness in their Jeep Cherokee replaced. Plaintiffs concede that they paid for this replacement in April 2019—some 20 months after they filed this suit in August 2017. *Compare* Doc. 121 at 31 (plaintiffs "had their Jeep repaired on April 4, 2019" and replaced the wire harness) *with* Doc. 1-1 at 3 (Class Action Pet. for Damages filed July 20, 2017).

But, other forms of plaintiffs' alleged damages survive this timing requirement. For example, the Fifth Amended Complaint asserts that plaintiffs incurred "overpayment damages caused by paying more than they would have [paid for their vehicle] had they been told that their car[] had a defective wire harness." Doc. 121 at 6. Plaintiffs allege that they purchased and overpaid for their Jeep Cherokee on August 9, 2014. *Id.* at 7, 26. And, plaintiffs assert out-of-pocket costs for trips to dealership appointments in 2016 and 2017. Doc. 121 at 27–28; s*ee also* Section I.B.2, *supra*, at 9–10 (summarizing allegations about trips to a Lee's Summit, Missouri dealership and, later, towing plaintiffs' vehicle to a Kansas dealership). These alleged losses

amply preceded this lawsuit and thus honor the timing requirements of *S. Utah Wilderness Alliance*.

Plaintiffs also have persuaded the court that their overpayment damages can satisfy Article III's standing requirement. *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 951 (holding damages requirement of *Lujan* met because plaintiffs "have identified a particular reasonably narrow range by which they allegedly overpaid for" their vehicle); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d at 1052 (holding "overpayment theory" satisfied *Lujan* because plaintiff "paid a premium for a 'clean diesel' vehicle which actually polluted at levels dramatically higher than a reasonable consumer would expect").

In sum, plaintiffs have discharged their burden under the first of *Lujan*'s three requisites. They have pleaded at least one "injury in fact." The court now turns to the second of *Lujan*'s requisites.

### 2. Are plaintiffs' injuries fairly traceable to defendants' alleged RICO violation?

*Lujan* next requires federal court plaintiffs to plead causation. Specifically, to establish Article III standing, plaintiffs must allege facts that, if true, can establish "a causal connection between the injury [they allege] and the conduct complained of . . . ." *Lujan*, 504 U.S. at 560. As *Lujan* explained, the alleged injury "has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] independent action [by] some third party not before the court." *Id.*

This standard means that the court must carefully identify "the conduct complained of" in the Fifth Amended Complaint. The gravamen of that conduct is expressed in pages 44–61 of the Fifth Amended Complaint. There, plaintiffs allege that defendants used a sham recall (Doc. 121 at 44) to defraud plaintiffs—and others like them—by: (a) representing that "there was a

'permanent remedy' for the problem [in the affected vehicles] that included replacement parts" (*Id.* at 51); (b) promising that FCA US "would be installing" those replacements parts "as soon as they were" available (*Id.*); (c) FCA US instructing its dealers to install a software patch that didn't truly repair the wire harness's problem (*Id.* at 52); and (d) erecting a "Sham Recall Enterprise" and associating themselves and others "for the common purpose of enriching themselves at the expense of vehicle owners by defrauding the vehicle owners out of the true value of a recall, which they had promised both consumers and NHTSA would occur" (*Id.* at 54). This conduct, plaintiffs allege, amounts to a RICO enterprise and caused defendants to engage in a "pattern of racketeering," as RICO defines that term. *Id.* at 55. Plaintiffs argue that this pattern violated the federal mail fraud and wire fraud statutes "hundreds if not thousands, of times." *Id.* (citing 18 U.S.C. § 1841). Finally, plaintiffs allege, defendants corrupted an official proceeding under 18 U.S.C. § 1512(c)(2) by providing "fraudulent submissions to an official government agency as part of an official proceeding." *Id.* at 55–56.

This aspect of *Lujan* also makes it important to identify the "action of defendant" that is not challenged by the Fifth Amended Complaint. That controlling pleading never asserts a product liability or warranty claim. Indeed, the Fifth Amended Complaint explicitly disclaims any intention to assert those claims: "To be clear, [p]laintiffs are not suing on a breach of warranty theory and are not claiming product liability or breach of warranty damages caused by the wire harness malfunctioning." *Id.* at 32.

The next two subsections apply this causation requirement to the two kinds of injury allegedly caused by defendants' RICO violation.

###### a. Overpayment Damages

The Fifth Amended Complaint tries to connect the alleged overpayment injury to the alleged RICO violation—the "sham recall" as plaintiffs call it—by claiming plaintiffs were injured by the "sham recall [because it] did not provide the 'parts' and 'permanent remedy' that were promised . . . ." *Id.* at 32. Plaintiffs claim that they overpaid for their vehicle because of the alleged wire harness defect. But they never allege that defendants knew or should have known that the vehicle plaintiffs purchased had a defective harness in it. Indeed, plaintiffs allege "it is only because of the scheme to defraud implemented by [FCA US and ZF NA] that they have not received the real recall they were promised." *Id.* at 20; *see Tae Hee Lee*, 992 F. Supp. 2d at 972 (finding plaintiffs' "bargained-for benefit claim" failed because plaintiffs did not allege defendant "made representations" about the allegedly defective vehicle feature). And, plaintiffs also assert, "the proper focus is the economic injury caused by the sham recall—which was completed the moment that [FCA US and ZF NA] effectuated their sham recall." Doc. 121 at 22. Plaintiffs allege that "[although] the scheme to defraud began years before,[10] it first surfaced around July-November 2016 when [FCA US] informed owners of the defect in the [w]ire [h]arness in their vehicles." *Id.* at 14. Plaintiffs purchased their Jeep Cherokee on August 9, 2014. *Id.* at 26.

Plaintiffs continue to rely on *In re Chrysler-Dodge-Jeep* and *In re Duramax*—decisions by California and Michigan district courts—as persuasive authority that their alleged damages establish standing. But, even with plaintiffs' new overpayment theory of injury, the allegations in those cases differ materially from the ones made here.

---

[10] The Fifth Amended Complaint alleges that ZF NA and FCA US knew about the defect in the wire harness in "2014" or "well before" the sham recall. Doc. 121 at 5. But, the Fifth Amended Complaint never alleges any connection between this alleged knowledge and the overpayment damages that plaintiffs claim they sustained when they purchased their Jeep Cherokee in 2014.

The plaintiffs in *In re Chrysler-Dodge-Jeep* and *In re Duramax* alleged that they had overpaid for a specific feature of their vehicles. *In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 946 (plaintiffs alleged they overpaid for vehicles "based in part on FCA US's representations that the vehicles were ECO Diesel vehicles (i.e., reduced emissions)"); *In re Duramax*, 298 F. Supp. 3d at 1052 (plaintiffs alleged "they paid a premium for a 'clean diesel' vehicles which actually polluted at levels dramatically higher than a reasonable consumer would expect"). Indeed, plaintiffs in both cases asserted that they had paid a premium for a particular feature of the vehicles based on defendants' representations about the feature. *Id.* But, importantly, the plaintiffs in both the California and Michigan cases alleged defendants' RICO violations began before they purchased their vehicles. *In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 951–52 (noting, "plaintiffs allege that [defendants] participated in a scheme and conspiracy with [others] to develop, implement, and conceal software used in the Class Vehicles to cheat emissions tests."); *In re Duramax*, 298 F. Supp. 3d at 1052–53 (finding plaintiffs' injury was traceable to defendant's action because defendant "developed the Duramax engine (including the alleged defective devices), marketed its diesel vehicles as environmentally friendly, and set the MSRP for its diesel vehicles.").

The controlling question here is whether plaintiffs' alleged overpayment alleged in this case occurred before defendants' alleged RICO violation—the "sham recall." On its face, the Fifth Amended Complaint has alleged an injury in fact—plaintiffs overpaid for their vehicle— and plaintiffs' allegation connects that injury to a manufacturing error. Doc. 121 at 28. But, the Fifth Amended Complaint doesn't assert a manufacturing defect claim. Instead, it asserts a RICO mail fraud claim. And the standing problem for the Fifth Amended Complaint is the same one that plagued its ancestors: the pleading never alleges any facts to connect plaintiffs' alleged

injury to the RICO violation their pleading asserts.  *See id.* (plaintiffs allege they received "a defective vehicle at the time of purchase" and were "*then* defrauded [by a] misleading software update" (emphasis added)).  The allegation that defendants failed to provide a permanent remedy for the alleged defective part in plaintiffs' vehicle does not connect defendants' alleged RICO violation to plaintiffs' overpayment injuries, which, by plaintiffs' own admission, occurred earlier "at the time of purchase" in 2014.  *Id.*; *see also Stewart v. Kempthorne*, 554 F.3d 1245, 1254 (10th Cir. 2009) (finding that plaintiff must show that the defendant's action "lead[] directly" to plaintiff's injury).

In sum, the Fifth Amended Complaint fails to make any allegations that, if true, could fairly trace defendants' RICO violation to plaintiffs' overpayment injury.[11]  *See Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451 (10th Cir. 1996) ("To establish causation, a plaintiff must show its injuries *are fairly traceable to the conduct complained of*." (emphasis added)).

### b.  Out-of-Pocket Damages

The court's conclusion about overpayment damages leaves the second injury claimed by the Fifth Amended Complaint.  This second injury consists of two distinct parts:  (1) damages caused by a December 5, 2016 trip for the software update, and (2) damages caused by a later trip to an unspecified Kansas dealership where plaintiffs discovered that the first dealership had installed a software update in their Jeep Cherokee.  *See* Section II.B.1, *supra*, at 16–18.  The court must decide whether the Fifth Amended Complaint pleads the requisite "causal connection" between the damages and "the conduct complained of" by their Fifth Amended

---

[11]     The court's prior Order addressed overpayment damages.  *See* Doc. 119 at 19.  But, nothing in that Order relieved plaintiffs' obligation to plead facts sufficient to allege that defendants' RICO violation had caused plaintiffs' injuries.

Complaint, *i.e.*, the "sham recall." *Lujan*, 504 U.S. at 560. Below, the court separately discusses the two trips plaintiffs allege they made to FCA US's dealerships.

### i. The December 5, 2016 Dealership Trip

Plaintiffs claim that when they received defendants' recall notice, they made a December 5, 2016 trip to a dealership to have the recall performed. Plaintiffs assert they sustained damages in the form of "out of pocket costs by having to travel to the dealership and spend time and gas money doing so." Doc. 121 at 27. The problem relying on this injury to establish standing is that plaintiffs' allegations never allege any "causal connection" between the alleged "sham recall" and the December 5 dealership trip. While plaintiffs assert that they experienced "an increasing number of problems" with their Jeep Cherokee before this dealership appointment, i*d.*, they never assert that any of these "problems" resulted from the sham recall. More problematic yet, plaintiffs concede that the purpose of this dealership trip was for "a service appointment" "to have [the] recall . . . performed on their vehicle." *Id.* So even if plaintiffs had received everything they allege defendants failed to provide—a fully transparent recall notice and a replacement wire harness—plaintiffs still would have had "to travel to the dealership and spend time and gas money doing so" to install a wire harness. *Id.* at 27. Consequently, the Fifth Amended Complaint fails to allege any basis for a rational finding that these out-of-pocket damages were caused by the sham recall that their RICO claim asserts. It thus fails to satisfy the second of *Lujan*'s three requirements. [12]

---

[12] The court recognizes that plaintiffs allege they made an extra trip to a dealership to replace their wire harness in April 2019. Doc. 212 at 31. That trip likely would meet *Lujan*'s causation requirement. But, as discussed above, the court cannot consider those alleged damages because plaintiffs incurred them after filing this lawsuit. *See S. Utah Wilderness Alliance*, 707 F.3d at 1155 (standing is determined using events existing "when complaint was first filed" even if plaintiffs later amend the complaint).

### ii. The Second Dealership Trip

Plaintiffs also claim injury in the form of out-of-pocket costs caused by a second trip to a dealership. The Fifth Amended Complaint doesn't specify which dealership they visited this time, or precisely when they did so. It alleges, however, that they made this trip to a Kansas dealership and did so after the December 2016 trip to a different dealership. *Id.* at 28. But the Fifth Amended Complaint is clear in one important respect: Why plaintiffs made this second trip to a dealership. It alleges that plaintiffs had their Jeep Cherokee towed to this dealership after it "would not start one day." *Id.* In contrast, they never allege that defendants' "sham recall" caused their Jeep Cherokee not to start. And, plaintiffs never allege their vehicle's failure to start had "any relation to the wire harness." *Id.* In short, plaintiffs made this second trip to a dealership because their Jeep Cherokee didn't work. But they don't allege that defendants' sham recall caused their vehicle's problem or otherwise caused them to make this trip. [13]

Summarizing the court's analysis, the Fifth Amended Complaint never alleges any facts that can establish what is required by *Lujan*'s second requirement. Plaintiffs have not demonstrated—as *Lujan* requires—"a causal connection between the injury [they allege] and the conduct complained of . . . ." 504 U.S. at 560.

---

[13] During this second dealership visit, plaintiffs also allegedly learned of the software update installed in their Jeep Cherokee's first trip to a dealership. Presumably, this refers to a software update purportedly installed in plaintiffs' vehicle during its December 2016 trip to a dealership for the recall maintenance. These allegations connect, at least somewhat, their second trip to a dealership and the "sham recall" alleged by the Fifth Amended Complaint. But, plaintiffs plead no facts capable of establishing a causal connection between that recall and the second dealership trip because the Fifth Amended Complaint never alleges that plaintiffs' discovery of the software's installation caused their injury.

### 3. Summary of Article III Standing

As explained above, the Fifth Amended Complaint discharges *Lujan*'s first requirement. It sufficiently alleges "injur[ies] in fact" in the form of overpayment damages and out-of-pocket expenses. *Lujan*, 504 U.S. at 560. But the Fifth Amended Complaint fails *Lujan*'s second requirement because it never pleads any facts that could support a "causal connection between the injur[ies alleged] and the conduct complained of." *Id.* The absence of such allegations means plaintiffs have failed to establish Article III standing. Given this conclusion, the court need not address *Lujan*'s third element, or any other issue raised by the parties.

## IV. Conclusion

The court holds that the Fifth Amended Complaint has failed to establish Article III standing. This conclusion leaves the court without subject matter jurisdiction. *See Rivera*, 708 F. App'x at 513 ("Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction that [courts] must address . . . ." (internal quotations omitted)). Lacking jurisdiction, the court grants FCA US's Motion to Dismiss (Doc. 124) and ZF NA's Motion to Dismiss (Doc. 128). This action is dismissed without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("Since standing is a jurisdiction mandate, a dismissal with prejudice for lack of standing is inappropriate . . . .").

**IT IS THEREFORE ORDERED THAT** FCA US's Motion to Dismiss (Doc. 124) and ZF NA's Motion to Dismiss (Doc. 128) are granted.

**IT IS FURTHER ORDERED THAT** the case is dismissed without prejudice. The court directs the Clerk of the Court to close the case.

**IT IS SO ORDERED.**

**Dated this 4th day of March, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**